(92 App. Div. 467.)

### SPIER v. HYDE et al.

(Supreme Court, Appellate Division, First Department. March 18, 1904.)

1. CONTRACTS—POOL OF STOCK—INTEREST OF PARTIES.

An arrangement whereby stock in a corporation was pooled for the purpose of sale, and plaintiff was to receive the difference between $22.50 and $27 on 250 shares if the sale did not amount to over $27, but, if the sale was made at over $27, the profits on the whole stock were to be equally divided between plaintiff and defendants, gave plaintiff a direct interest, as owner, in 250 shares, coupled with a contingent interest in the whole, while defendants had an interest in the remainder, subject to plaintiff's contingent interest.

2. SAME—PARTNERSHIP RELATION—FIDUCIARY CHARACTER.

An arrangement whereby corporate stock was pooled to be sold, and plaintiff and defendants were to receive stated proportions of the profits, created a joint interest in them, and, whether it amounted to a technical partnership or not, it was governed by the same rules; the relation of the parties being fiduciary, and imposing on the party vested with power to deal with the stock the obligation to account to the others, and to affirmatively show a faithful discharge of his trust.

3. TRUSTEES—EXTENT OF POWERS—GOOD FAITH IN EXERCISE.

That the power conferred on a trustee to deal with property is broad enough to permit him to deal with it in any way does not discharge him from the obligation of good faith towards those for whom he acts, or discharge him from the duty of fairly accounting for what he receives, and protecting the rights of his associates.

4. CONTRACTS—DISCHARGE—SUBSEQUENT CONTRACTS.

A subsequent contract superseding a prior one determines the enforceable rights of the parties in the transaction governed by the contracts.

5. CONTRACTS—CONSTRUCTION—POOL OF STOCK—POWERS OF PARTIES.

Plaintiff and defendants were the owners of 10,100 shares of stock in a corporation, the total stock of which amounted to 20,000 shares; plaintiff's interest being 250 shares. Defendants formed a scheme of taking over the total stock of the corporation and organizing a new company, and contracted to pay plaintiff for his services and for his stock, the control of which was necessary to bring about the scheme, 15 per cent. of the

net profits after the 10,100 shares had been pooled and sold, and $22.75 had been deducted on each share; the 15 per cent., however, to relate only to 10,100 shares of the "new company," and to the net profits to be derived from the sale thereof "on the basis as above stated." The provisions preceding the quoted clauses stated the defendants' intention to exchange the shares of the old company for an "equal number of shares" of the new, but defendants were given power to modify or change the plan proposed. *Held*, that the whole contract must be construed together, and defendants could not change the plan, to plaintiff's detriment, without his consent, and, by the increase of the number of shares of capital stock in the new company, determine plaintiff's rights on the basis of the increase, but, in case of such an increase in the number of shares, defendants would have to pay plaintiff his share of the profits on the basis of the exchange value of the stock of the old company as represented in the shares of the new.

6. SAME—SUPERSEDING CONTRACTS—DUTY TO DISCLOSE FACTS.

Where plaintiff and defendants had entered into a contract whereby they were to pool their stock in a corporation for the purpose of forming a new one and selling its shares, and defendants were given a discretionary power in the mode of bringing about the result, plaintiff being in the employ of one of the defendants and largely subject to his control, defendants were bound to fully disclose all the facts in connection with the transaction and business conducted by them, on entering into any new contract with plaintiff readjusting his share of the profits in the transaction.

7. SAME—BAD FAITH—EVIDENCE.

Evidence *held* to show that defendants, on entering into a contract superseding a former contract fixing plaintiff's compensation in the pool of stock in an old corporation and the formation of a new one, did not fairly and fully disclose matters affecting plaintiff's rights.

8. SAME—REPRESENTATIONS OF FACT.

Representations as to the terms of an existing contract between defendants and an underwriter for the disposal of corporate stock, and of defendants' opinion as to the number of shares which would be in a pool in which plaintiff was interested, which representations induced plaintiff to enter into a contract with defendants fixing his profits, were representations of fact, and, being false, sufficient to avoid the contract, although the contract with the underwriter was yet to be fulfilled.

9. SAME—ACCOUNTING—ITEMS COVERED.

Where plaintiff entered into a contract with defendants whereby he was to have for his services and stock contributed to a pool 15 per cent. of the net profits on a certain number of shares, he was not entitled to any interest in, or an accounting for, additional shares subsequently purchased by defendants.

10. ACCOUNTING—APPOINTMENT OF RECEIVERS—NECESSITY.

On an interlocutory judgment for an accounting of plaintiff's share of the profits from the sale of stock, it was not necessary to appoint a receiver to protect plaintiff's rights.

Ingraham, J., dissenting.

Appeal from Special Term, New York County.

Action by Charles L. Spier against Charles L. Hyde and William R. Garrison. From an interlocutory judgment directing an accounting, defendants appeal. Modified.

See 79 N. Y. Supp. 699.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

Franklin Bartlett, for appellants.
H. Snowden Marshall, for respondent.

HATCH, J.   There was a former appeal in this case from an interlocutory judgment entered therein in favor of the plaintiff and against the defendants, and upon such appeal the judgment was reversed.   78 App. Div. 151, 79 N. Y. Supp. 699.   In the opinion there written the substance of the pleadings forming the issue between the parties was stated, and also the principal contracts relied upon by the parties were set out in full in their pleadings, and considered by the court in making disposition of the appeal.   It is not necessary, therefore, that the issues be stated herein in detail, or that the contracts be again set out in full. The issues upon the trial, save in one respect, which is not controlling in the disposition of this appeal, are the same as they were before. The contracts relied upon, which determine the rights of the parties, are the same; and we have now to consider whether the construction placed upon the principal contract by the learned court below is correct, and whether the effect given to the testimony can be sustained.   In this view, it becomes necessary to call attention to the exact relations which existed between the plaintiff and the defendants at the time of the inception of the enterprise resulting in the claims that are made in this action.

At the instance and request of the defendants, the plaintiff procured options on 10,100 shares of stock, being a controlling interest in the Goodson Type Casting & Setting Machine Company, a corporation organized under the laws of the state of Minnesota.   When the plaintiff entered upon the business of procuring options upon this stock, it was with the understanding between himself and the defendants that he was to give his services in connection therewith free of charge, and the defendants were to furnish the money to pay for the stock when the options should be obtained.   This agreement was oral, was carried out, the plaintiff obtained the options, and the defendants paid therefor at the rate of $8 and $11 a share for the stock so obtained.   After the options were secured, plaintiff and the defendant Hyde had a conversation relating to the interest, as compensation, which the plaintiff should receive in connection with the venture.   After the matter had been discussed, the defendant Hyde wrote out the following memorandum, which was O. K.'d by Hyde and the plaintiff at the time:

"10,100 shares in the pool                                    O. K. H.
  5,100 H. & G.                                              O. K. S.
  ————
  5,000
   250 Chas. L. Spier

  4,750 at 22½—about $106,875.
"H. & G. receive $106,000.
"Spier receives 250 shares of stock in the pool.
"Now if we sell the stock above 22½ Mr. Spier will be entitled to receive the difference between 22½ and 27, to be taken in stock at 22½ per share. If we sell at over 27, then profits to be equally divided between Garrison, Spier & Hyde."

This conversation and the preparation of this writing by the defendant Hyde are undisputed.   It is to be observed that, by the provisions of this writing, the 10,100 shares of stock were to be pooled, and, of these shares in the pool, the plaintiff's interest was 250 shares.   The

unit of value for this stock was fixed at $22.50 per share, which sum was first to be accounted for to the pool. If the pool stock upon a sale sold for $27, then the plaintiff was entitled to receive the difference between such sums upon his shares. If the stock sold above $27, then the profits upon the whole were to be equally divided between the plaintiff and the defendants. It is evident from this arrangement that Spier's direct interest in the pool at that time was in the 250 shares of stock, coupled with a contingent interest in the whole. The defendants' interest was in the remainder, subject to plaintiff's contingent interest. Under this arrangement, therefore, the plaintiff's interest was in a specified number of shares of stock. He owned those shares for the services which he rendered, and the defendants owned the remaining shares of the pool stock for the money which they advanced, or which was to be advanced. The stock at this time had not come into the possession of any of the parties in interest. It was represented by the options which the plaintiff had obtained. Subsequently the 10,100 shares of stock were taken in the name of the plaintiff. He, however, never had actual possession of these shares, as physically they came to the hands of the defendant Hyde. The plaintiff executed an assignment of the shares of stock either to Hyde or the defendants, and Hyde retained possession of them. The intention of the parties at this time, so far as it was expressed in this memorandum, was to sell these shares of stock at an advance, reap the profits on the terms prescribed, and make the division based upon the prices obtained. If the transaction had stopped here, it is quite evident that the plaintiff would be regarded as the owner of the 250 shares of stock, as that was the apportionment under the arrangement. He had the same title to his 250 shares that the defendants had to the remainder, and, upon a sale of the same, or other disposition being made, he could enforce his right to the 250 shares, and to whatever profit was made in the whole number of shares above $27 per share. In the disposition, however, which was made of this stock, the defendants were to have a controlling voice, based upon the fact that they furnished the money with which to make the purchase. The relation, however, which was thus created between the plaintiff and the defendants, was joint in interest. Whether it became a technical partnership, as matter of law, or whether it constituted a mere joint venture, is not of consequence. The respective interests were settled. Such interests were placed in a common pool, to be used and disposed of for the benefit of all, and the legal rules applying to such an agreement are precisely the same as are those which apply to a partnership in technical sense, and rights are to be enforced upon the same principles. King v. Barnes, 109 N. Y. 267, 16 N. E. 332; Marston v. Gould, 69 N. Y. 220. Such relation is fiduciary in character, and the most scrupulous good faith in dealing is required at the hands of the party who has been invested with the power to deal with the property, and in equity he may be called upon to account for the property so held. He becomes a trustee for his associates in interest, is their agent in the transaction, and is not only bound to account for the property and its proceeds, but the burden is imposed upon him to show that he has discharged his trust with fidelity. Marvin v. Brooks, 94 N. Y. 71. It is of small consequence that the language used in con-

ferring power to deal with respect to the property intrusted to the hands of the trustee is broad, to the extent of permitting him to deal with it as he chooses. It does not discharge him from the obligation of good faith in dealing; nor is he discharged from fairly accounting for all he received, or from protecting the rights and interests of the associates whom he represents. Rather is his obligation increased thereby. It confers upon him no arbitrary power to deal with the property without regard to the rights and interests of his associates, for, the relation being fiduciary, he is not only under a moral, but also under a strict legal, obligation to act in good faith, and to fulfill the trust committed to his care with complete fidelity. In process of development, it was concluded by the parties that the 10,100 shares of stock could be used to better advantage by the formation of a new corporation, which should enter into a contract with the Minnesota corporation, and take over, so far as possible, its stock and holdings. The capital stock of the Minnesota corporation was 20,000 shares. The 10,100 shares upon which the plaintiff held options were therefore the controlling interest. The defendants, however, after the agreement heretofore mentioned, did not own a controlling interest of such corporation. Plaintiff's holding was absolutely essential to the carrying out of the scheme to form a new corporation, which they would be able to control in its creation, and in dealing with the Minnesota corporation, and thereby be enabled to dictate the terms upon which such corporation should be formed, so far as the statute permitted. It is therefore plain that the plaintiff was an essential factor in the success of such scheme, and the shares allotted to him were necessary to go into the common pool in order to make it a success. The defendants recognized this condition, and therefore made the proposition to the plaintiff, contained in the letter called the contract of March 27, 1899. This contract superseded the prior arrangement in February, and undoubtedly whatever rights the plaintiff now has, which may be enforced by action, are to be determined by a construction of this contract. The contract itself, however, did not disturb the relations which existed between the plaintiff and the defendants. The defendant Hyde was the active manager and manipulator. He was, in legal effect, the agent and trustee for his associates, and so remained under this contract, and continued so to remain during the whole course of the dealings in the execution of the proposed plan. Whatever views Mr. Hyde may have held with respect to the duties and obligations which he owed to the plaintiff, and whatever the powers of which he conceived himself to be possessed by virtue of the contract, he recognized the fact that Garrison and Spier were his associates after the contract was executed, and so testified. This relation, however, is not of special significance in construction of the contract of March 27th. As to that contract, the plaintiff was informed concerning it, accepted its terms, and no claim is made that he was misled as to its conditions, or that he was not at that time fully informed concerning his rights.

It must be borne in mind, in considering the contract, that plaintiff was the owner of 250 shares of stock, and that he had a contingent interest in the remainder of the shares owned by the defendants. This interest made him a necessary party to the reorganization, and it was

so recognized by the defendant Hyde, for, after reciting an intention, if the patents proved satisfactory, to form a corporation, he states, "We should like to have your assistance." And again, "If you join us" a provision would be made for profits. It cannot be questioned but that this contract provides for the placing of the 10,100 shares of stock then owned by the pool. The agreement so recites, and that such stock was to be charged for at the rate of $22.75 per share, which was an advance of 25 cents a share over the agreement made in February. It then expressed the hope to have the stock underwritten or sold, and, if such expectation were realized, to reserve a part of the money from such source as working capital and to defray expenses. If the plaintiff joined in this proposal, the contract provided that the profits upon the 10,100 shares, if pooled, would be estimated as the net sum realized upon the sale of the stock, after deducting the $22.75 per share and expenses, and "after deducting further whatever sum of money those depositing stock in the pool may desire to reserve" for the use of the company, as working capital. The contract then provides that all questions relating to modifications or change were to be determined by the defendants. And as consideration for the plaintiff's services in the matter, and in consideration of his subsequent devotion of his entire time for the promotion of the new company, there would be set apart for him, as full compensation, viz., his stock and his services, 15 per cent. upon whatever net profits may be found to have been realized by a sale of the pooled stock "after the entire 10,100 shares have been pooled and sold." Down to this point in the contract, it is plain and unambiguous; and it gave to the plaintiff, in terms, 15 per cent. of the whole of the net profits of the venture, after deducting the price of the stock at $22.75 per share, the expense of promotion, and the setting aside of a working capital. There is not a syllable in this contract which refers to any stock to be issued by the new company, except as there is the expression of intention hereafter noticed. The whole subject-matter of the arrangement related exclusively to the 10,100 shares of the Minnesota corporation, which had theretofore been pooled, and it was of profits in relation to that 10,100 shares of stock which should be made that the plaintiff was to receive 15 per cent. in consideration of the transfer of his stock and the rendition of his services. Then follows the clause:

"It is understood, however, that this 15% interest relates only and applies solely to the 10,100 shares of stock of the new company and to the net profits if any to be derived from the sale thereof on the basis as above stated."

At first reading, this clause appears to be a positive, distinct limitation of the plaintiff's interest to 10,100 shares of stock of the new company. It is to be observed, however, that such is not its entire language or meaning. Plaintiff's rights cannot be construed solely from this clause of the contract, for by its terms it refers to the preceding provisions of the contract, and makes the profit upon the number of shares of stock to rest upon the basis stated therein. Consequently resort must be had to that basis in order to arrive at a correct conclusion. The preceding provisions of the contract are:

"The new company may be called the Goodson Graphotype Company, and it is our intention to exchange 10,100 shares of its stock for an equal number

of shares of the Goodson Type Casting & Setting Machine Company." "We expect to place these 10,100 shares of stock of the Graphotype Company [i. e., the new company] in portions from time to time in a pool to be charged to the pool at the rate of $22.75 per share."

It thus appears that the intention was thus expressed in the letter which contained the proposal, and therefore the basis for the contract, that the 10,100 shares of the old stock should be exchanged for 10,100 shares of the stock of the new company on precisely the same basis, as to value, as the stock of the old company, and it was that stock received in the exchange which was to be pooled at the same rate. It is quite evident that if the stock of the old company was to be used entirely in exchange for an equal number of shares of stock of the new company, and there were no more shares of stock of the new company issued, then there would be no exchange of value, but simply an exchange of securities representing the same value, so that there would be simply the exchange of securities of the pool, and the profits were to be based and paid upon what was realized from this stock as pooled. If that scheme were carried out, therefore, whatever profits, either in the form of stock or of cash, or otherwise, which arose by reason of the use of the pooled stock of the old company, it was to have equal representation in all respects in the same number of shares of the stock of the new, and it was upon this basis that the limitation in the contract was made of the plaintiff's 15 per cent. So that, in any event, no matter what it was called, or what mutations the 10,100 shares of the stock of the old company underwent, its equivalent in value was to be represented by securities which were taken in exchange, and it was upon that basis that plaintiff's 15 per cent. of the profits was reserved. Such intention was not carried out. The defendants were not obligated to carry out that particular plan, as the contract contained a provision authorizing modification and change by the defendants; and this related to the terms of the sale of the pool stock, and to the reservation of proceeds for expenses, and in modification and changes in plans. Undoubtedly there was given this right in the broadest terms, but such right could not be exercised in such form and manner as to deprive the plaintiff of his property, or of the interest which he was to receive. There were no 10,100 shares of stock of the new company exchanged for 10,100 shares of stock in the old company. On the contrary, the last-mentioned stock was made basis for the whole issue of stock by the new corporation. It paid expenses, it provided a working capital, it resulted in profits to a very large amount, and the defendants seemed to have reaped from the transaction what would be to modest men a handsome fortune. Consequently no construction of this contract ought to be adopted which deprives this plaintiff of the benefits which were represented by the property which he owned, the arrangement which he made, and the contract which he signed. The defendants could not by change and modification manipulate the 10,-100 shares of stock by a different method from that represented in the contract, and then exclude the plaintiff from profits based upon a consideration of an equal number of shares of stock, much lessened in value by reason of the amount of the issue, and say that the separation of an equal number of shares, nominally of the same value, would an-

swer its requirements. In the fulfillment of this contract, the relation which the defendants bore to the plaintiff was fiduciary in character, and they owed him a duty of carrying out the terms of this contract so as to protect his interest. If they made changes and modifications, they could not make them at the expense of the plaintiff, without his consent,. given upon a full disclosure of all the facts. While they might make modifications and changes in broadest form, yet they were required, in making such modifications and changes, to protect the plaintiff's property interest in the subject-matter, and so that he might realize therefrom the equivalent of what he would have realized had no change been made. It seems clear, therefore, that the 15 per cent. which was to represent the plaintiff's interest under the proposed scheme was 15 per cent. of the value of the 10,100 shares of the old company, and the contemplated exchange of this stock was for stock of the new company, equal in value to the stock of the old, and the defendants could not, by modification and an increase of capital stock, swell the volume to be issued, and then determine plaintiff's rights thereunder, based upon an equivalent number of shares of the new company. We are of opinion, therefore, that the last clause of the contract must be construed in connection with the facts as they existed prior to the time when it was made, of the contemplated scheme expressed in its provisions, and of the acts of the parties thereunder. Really the question goes not so much to the construction of this contract, but rather to the manner and method of its execution. If it had been carried out, as proposed, plaintiff's 15 per cent. would have been based upon the value of the stock of the old company, whether it was represented by it, or its equivalent in the new. As executed, the shares of stock of the new company were very much reduced in value. But the stock of the old company was the basis for and represented all of the stock issue of the new. We are therefore of opinion that the construction placed upon this contract by the learned court below was correct.

It does not follow from this view, however, that the plaintiff is necessarily entitled to the judgment which has been rendered. It is conceded that on May 8th, after the contract with Talbot J. Taylor & Co., who were the underwriters of the issue of stock of the new corporation, had been executed, the parties hereto entered into another contract, which in terms defined the plaintiff's interest, and the amount which he was entitled to receive, arising out of the whole transaction. If that contract were made by the defendants with the plaintiff after full and complete discharge of the duties which they owed to him, and without misrepresentation or fraud upon their part, then there is an end of this lawsuit, and the judgment appealed from cannot be sustained. In considering this branch of the case, we must bear clearly in mind the relations which existed between these parties at the time when this contract was signed. That relation upon the part of the defendants still remained fiduciary in character, and they were bound at that time to make full and complete disclosure of all of the facts connected with the transaction; and, in dealing with the plaintiff, they were bound to discharge the obligation of disclosure of existing conditions with scrupulous good faith and integrity. The plaintiff was then in

the employ of the defendant Hyde, and was in large measure subject to his control and direction. Mr. Hyde evidently believed that such relation upon his part did not require a full disclosure of all of the transactions, but only of such as he chose to make. Upon this subject the defendant Hyde was asked and answered:

"Q. And you were the pool manager, and owed him the duty of confidentially telling him of everything that took place? A. No; I thought I could tell him what I chose. It is not my habit of telling my subordinates anything I do unless I choose to do so. There are certain things a man has to keep to himself. In this case I told Mr. Spier what I thought he ought to know."

Both defendants testified that, on the morning of the day when this contract was executed by the plaintiff, the defendant Hyde upbraided and scolded the plaintiff for dereliction of duty which he was employed by Hyde to perform, and for which he received a salary of $50 per week. And it was after such upbraiding that he proposed the terms upon which the contract of May 8th was based. It is fairly disclosed by the testimony that the defendant Hyde occupied quite a different attitude to the plaintiff as an associate than to Garrison, his other associate. Between the two defendants there were evidently terms of equality in dealing and disclosure. The plaintiff was regarded as a subordinate, as he was in fact in employment, and was deemed to be only entitled to such disclosure as the defendant Hyde saw fit to make regarding the transaction. From this relation there is some ground for saying that the parties did not at that time deal upon terms of equality, and this fact is to be taken into consideration in weighing the testimony which has convinced the trial courts that the defendants were guilty of misrepresentation. The plaintiff testified that at the time in question, and prior to the signing of the contract, the defendant Hyde stated to him that the profits of the pool were only about 2,475 shares, and that plaintiff's percentage of that would be about 361 and a fraction; that he was ignorant upon the subject; and that upon this representation he was induced to make the agreement. The plaintiff denied any knowledge of the contract which had then been made with Talbot J. Taylor & Co., and testified that at that time he did not know what were the profits of the pool to which he was entitled, and that he accepted the defendant Hyde's statement as a truthful statement of his entire interest under the contract, and, relying thereon, entered into the contract of May 8th. If this representation was made at that time, it constituted an untruthful statement of plaintiff's interest as provided for in the contract of March 27th, for, as we have seen, he was then entitled to 15 per cent. of the profits of the pool stock, and they were largely in excess of the number of shares of stock which the defendant Hyde claimed represented the entire pool interest, the subject of division. At this time the defendants knew the condition, and knew approximately what profits would result to them if the Taylor contract were carried out. It is also fairly disclosed by the evidence and the actions of the parties that at this time both defendants understood plaintiff's interest under the contract of March 27th and in the pool. The purpose of the meeting at this time was to arrange about the interest which plaintiff should receive, based upon the supposition that the Taylor contract would be fulfilled. It was

testified by a disinterested witness (Williamson) that Mr. Hyde stated to him about noon of May 8th that, by reason of the changed relations in the nature of the deal with Taylor & Co., "he had been obliged to squeeze or reduce the holding or share that Mr. Spier was to have in stock." Subsequently he modified this statement by leaving out Spier's name, who he would not testify was mentioned by name, but the witness distinctly understood that the squeezing out referred to Spier. The defendant Hyde was interrogated upon this subject, and gave this version:

"Q. And you stated to Mr. Williamson that you had thereupon concluded to squeeze Spier? A. I am not sure that any conversation occurred with Mr. Williamson that day. Mr. Williamson seemed to think that conversation did occur, but I am not clear that it did. I didn't tell Mr. Williamson that I was going to squeeze Spier. A. Did you say that you had been obliged to squeeze or reduce the holding that Spier was to have in the pool? A. Mr. Williamson says that. I don't. I deny that I used those terms. I am not sure I made any such statement on that date. I am not sure I did not. I am quite positive that I did not tell him I was squeezing Mr. Spier. I am not absolutely positive, but I don't believe I did."

This is far from a denial of Williamson's testimony, and its strong tendency is to lead the mind to believe that, in the relations which existed between the defendants and the plaintiff, his rights and interests were not cared for with that degree of fidelity which the relation and the law required. The conduct of the parties in respect to the transaction itself is open to suspicion. The defendant Garrison was notified by Mr. Hyde that he was going to have an important conversation with Mr. Spier, and he desired him to be within hearing distance, so that he might listen to what took place, and a stenographer in the office was directed to occupy a convenient place, where he could listen to what occurred; and this, taken in connection with the inequality of relationship between the defendant Hyde and the plaintiff, with the fact—for I think it must be so accepted—that the plaintiff was to be squeezed, or his holdings reduced, and were in fact reduced, and that all were directed to listen during the process, leads the mind to the conclusion that the plaintiff did not have that fair measure of protection which the law cast about him in his dealing with the defendants. And taking all of these facts into consideration, and the further fact that the plaintiff's profits under the agreement were reduced to the least possible amount, and that the defendants reaped from the same transaction a large and bountiful harvest, quite prepared the mind of the court for accepting the version of the transaction as given by the plaintiff, and in reaching the conclusion therefrom that the fact was that all the matters were not fully and fairly disclosed by the defendant Hyde at the time of this transaction, and thereby find that, by failure of disclosure and by fraudulent representations, the contract of May 8th did not become a legal, binding contract upon the plaintiff, and that he is entitled to enforce his right in this action.

It is said, however, that the representations, even if made by the defendant Hyde, were of future expectations, and not of present facts, and that, in any event, the representation as to the value of the pooled interests was mere matter of opinion, and could not by any possibility have been ascertained. The Taylor contract was a fact presently exist-

ing. The terms and provisions of that contract were the basis in respect of which the defendants were dealing. Each of them knew, if this contract was fulfilled, approximately what they would obtain. It provided in express terms for the capital stock of the corporation, its issuance to the defendant Hyde, what should be set apart for working capital, and how it should be provided. The number of shares of stock were known, and the parties were adjusting their relations and rights in respect of its existence. It was quite true that the corporation had not been formed, and also true that the contract with Taylor & Co. was conditional; but the contract with the plaintiff was based upon the conditions which appeared in the Taylor contract, and those conditions were known, and their future fulfillment was not a matter to which the representations related. For, if the existing contract was not carried out and fulfilled, then the contract which was made with the plaintiff on May 8th failed. It was made to depend thereon. So the representations with respect to which the parties were dealing were of present existing facts, although their binding obligation depended upon future events. The opinion expressed, if it could so be called, as to the number of shares which would be in the pool, was based upon the facts as they then appeared; and the opinion was based upon a certainty, if only the contract should be carried out. The representation, opinion, or statement which was made by the defendant Hyde was of a material fact then existing, and established by the contract, and not a mere matter of opinion, or the expression of an expectancy of what might occur. We reach the conclusion, therefore, that the fiduciary relation between these parties existed at the time of the contract of May 8th; that the representations then made by the defendant Hyde were not of expected events, but of existing facts; that the court was justified in finding that the defendants were guilty of a breach of their fiduciary relation, and that the representations claimed by the plaintiff to have been made were made; and that they were sufficient in avoidance of the contract. These views find support in Cowee v. Cornell, 75 N. Y. 91, 31 Am. Rep. 428; Butler v. Prentiss, 158 N. Y. 49, 52 N. E. 652; Kountze v. Kennedy, 147 N. Y. 124, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651; Hickey v. Morrell, 102 N. Y. 454, 7 N. E. 321, 55 Am. Rep. 824; Gray v. Richmond Bicycle Co., 167 N. Y. 348, 60 N. E. 663, 82 Am. St. Rep. 720; Brooks v. Martin, 2 Wall. 70, 17 L. Ed. 732; Smith v. Land & Property Corporation, 28 Ch. Div. 15. The finding of the court answers all of the requirements of a finding which established a fraud.

Although we reach the conclusion that a recovery in this case should be sustained, yet we also conclude that the judgment which has been entered herein is much broader than that to which the plaintiff is entitled. His interest is 15 per cent. of all profits derived from the 10,-100 shares of the stock of the old company, no matter what form such shares of stock assumed, or how the profits were derived from its use. By the judgment which has been entered, the defendants are required to account for other shares of stock, in which the plaintiff has no interest. If the defendant purchased other shares of stock of the old company, which were still outstanding, the plaintiff would have no interest therein, nor would plaintiff have any interest in profits made

therefrom. The accounting should therefore be limited to the 10,100 shares of the stock of the old company, and the profits derived therefrom, which is the measure of the plaintiff's right of recovery. Nor do we think that a receivership is necessary at this time to protect plaintiff's rights. The interlocutory judgment provides for an accounting, and when that is taken, and the amount is determined to which the plaintiff is entitled, the court can in the final judgment make such provision as is deemed necessary for the full protection of the plaintiff's interest.

The judgment should therefore be modified as expressed in this opinion, and, as modified, affirmed. No costs of this appeal allowed to either party.

O'BRIEN and McLAUGHLIN, JJ., concur. VAN BRUNT, P. J., concurs in result.

INGRAHAM, J. I do not concur in the affirmance of this judgment. I do not consider it at all necessary to determine the relation that existed between the parties to this action prior to the execution of the agreement of March 27th; but, as I understand it, under the prior agreement, if the stock in the pool was divided, the defendants were to receive 5,100 shares, the plaintiff 250 shares; and the balance of the stock in the pool was to be sold, the defendants to receive from the proceeds of that stock $106,000. If the 4,750 shares of stock sold above $22.50 per share, the plaintiff was to receive the difference between $22.50 and $27 in stock at $22.50 per share. If the stock sold for more than $27 a share, the amount realized over $22.50 per share was to be divided between Garrison, Spier, and Hyde. As I look at it, there was no partnership or joint adventure by which the defendants became trustees for the plaintiff. The plaintiff never became the owner of any stock. He had an agreement with the defendants by which he was to receive 250 shares of stock in the event that the arrangement was carried out, and a certain further sum in the event that profits were realized, as compensation for the services that he had rendered in relation to the transaction. The complaint alleges that prior to the execution of the agreement of February 24, 1899, Hyde had purchased 10,100 shares of stock of the Goodson Type Casting & Setting Machine Company, a corporation organized under the laws of the state of Minnesota; that he had paid in cash therefor $106,000; and that, in purchasing that stock, plaintiff had rendered certain services to Hyde, the compensation for which was secured to him by the agreement of February 24, 1899, which liquidated the claim for compensation for his work, labor, and services in obtaining the contract for this stock. Hyde had become the owner of the stock by purchase, for which he paid $106,000. He was indebted to the plaintiff for services which the plaintiff had rendered in procuring that stock; and he agreed to pay for such services by delivering to plaintiff 250 shares of the stock, and a contingent interest in the event that a portion of the stock was sold at a price which would realize a profit. There was here no joint adventure, no relation of trust, no partnership, but simply an agreement by Hyde to discharge an obligation that he was under to the plaintiff

for the services rendered. Under this agreement, there was no intention to organize a new company, or to deal with the stock in any way except to sell it. By the contract of March 27th an entirely different disposition of this stock was contemplated, which was inconsistent with the arrangement of February 24th, and which abrogated that agreement. The agreement of March 27th, instead of a sale of this stock, provided for the organization of a new company, and that the 10,100 shares of stock of the Type Casting & Setting Company then owned by Hyde were to be exchanged for an equal number of shares of stock in the new company. There was thus to be substituted in the possession of Hyde 10,100 shares of stock of the new company in place of stock of the old company that Hyde then owned; and the plaintiff necessarily, by joining in this understanding, relinquished all right that he had in profits that might be realized from the sale of the old company's stock. His right was limited by the agreement that he then made with Hyde. The new agreement provided that Hyde expected to place the 10,100 shares of stock of the new company in a pool, the stock to be charged to the pool at the rate of $22.75 per share, and that he expected to have this stock underwritten or sold; that a part of the money to be realized on that sale was to be paid to the company to be used as working capital, Hyde reserving the right to fix the amount; and the expenses in selling the stock were also to be paid. It was then understood that the profit to accrue in connection with the 10,100 shares of stock of the new company was to be the net sum realized upon the sale of the said stock, after deducting and repaying to the persons depositing it the sum of $22.75 per share, and deducting the expenses and the amount fixed by Hyde as working capital for the new company. Now it seems to me that this arrangement was entirely clear. Hyde and his associates had purchased the 10,100 shares of stock, paying therefor $106,000. They were to transfer that stock to the new company, and were to receive from the new company an equal number of shares of its capital stock. These 10,100 shares of the stock of the new company were to be placed in a pool, and, when sold, from the proceeds Hyde was to receive an amount equal to $22.75 per share for the 10,100 shares. There was also to be deducted from the amount realized upon the sale of the stock the expenses, and such a sum as should be paid to the company for its working capital, and the balance was to be considered as the profits in which the plaintiff was entitled to share. It was then provided that, as a consideration for the services rendered by the plaintiff, Hyde would be willing to—

"Set aside for your benefit as full compensation for your services fifteen per cent. of whatever net profits estimated on the above basis may be found to have been realized from the sale of the pool stock after the entire 10,100 shares have been pooled and sold"; and "it is understood, however, that this fifteen per cent. interest relates only and applies solely to the 10,100 shares of stock of the new company and to the net profit, if any, to be derived from the sale thereof on the basis as above stated."

By this agreement the plaintiff was limited to the 15 per cent. of the net profits upon the 10,100 shares of stock of the new company to be issued in exchange for old stock owned by Hyde. To this the plaintiff agreed, and it is this agreement that plaintiff asks to enforce. Hyde

proceeded to carry out this arrangement, and negotiations were commenced with a firm of bankers for a sale of the stock of the new company when organized. Those negotiations finally resulted in a contract between Hyde and the bankers, Talbot J. Taylor & Co. . That agreement recites that Hyde and his associates had acquired control of the Type Casting & Setting Company (the old company), and intend to organize under the laws of the state of New Jersey the Graphotype Company (the new company) for the purpose of acquiring the entire capital stock of the old company, and the ownership of the patents and other patents belonging to it; and the agreement provides that on or before May 23, 1899, Taylor & Co. should, in the event that their examination into the validity of the patents proved satisfactory, purchase from Hyde 10,000 shares of the preferred stock and 10,000 shares of the common stock of the new company; that the new company was to have 25,000 shares, of the par value of $100 each, of the preferred stock, and 25,000 shares, of the par value of $100 each, of the common stock; that the new company was to issue to Hyde 24,999 shares of preferred stock, and 25,000 shares of the common stock, for which Hyde was to deliver to the new company the 10,100 shares of stock of the old company and $374,000 in cash; Hyde to procure by purchase or exchange all of the balance of the stock of the old company, amounting to 9,900 shares, and to transfer it to the new company; and for each share of stock of the old company Hyde was to receive of the amount issued to him by the new company 1 share of preferred stock and 1 share of common stock; that in the event that Hyde was unable to acquire all of the stock of the old company by the 4th of September, 1899, he should on that date return to the new company the amount of common and preferred stock to which he was not entitled under the contract. It was further provided that on or before the 31st day of May, 1899, Taylor & Co. would pay to Hyde, in the event that their examinations of the machinery and patents owned by the company were satisfactory, the sum of $187,500 on account of 10,000 shares of preferred and 10,-000 shares of common stock of the new company, purchased by them from Hyde, and that the remaining $562,500 on account of such purchase was to be paid by Taylor & Co. to Hyde in three equal installments, payable July 1, 1899, September 1, 1899, and November 1, 1899, and Hyde was to deposit in a trust company 10,000 shares of the preferred stock and 10,000 shares of common stock, to be held by the company for one year from the date of the agreement, and not to be sold within that time. This agreement was signed on the 6th day of May, and, after it was signed, Hyde had an interview with the plaintiff at his office, when a new agreement was made, which the plaintiff alleges was induced by false and fraudulent representations of Hyde, and which the court below has found was void because of such representations.

It does not seem to be disputed that if the new agreement of May 8, 1899, is binding upon the plaintiff, this action cannot be maintained, and the right of the plaintiff to require an accounting from Hyde under the original agreement of March 27th depends upon whether or not the agreement of May 8th was properly abrogated. The defendant Hyde, who was corroborated by the defendant Garrison, denied having

made the representations claimed by the plaintiff, but, the court having found that such representations were made, we must assume that Hyde did make the representations testified to by the plaintiff; and the question first presented is whether those representations were proved to be false, so that a contract based upon them was fraudulent as against the plaintiff. To determine whether or not those representations were false, it is necessary to determine just what interest the plaintiff had at the time of his interview with Hyde which resulted in this agreement of May 8th. By the contract with Taylor & Co., Hyde was to get for the 10,100 shares of stock of the old company, and the payment to the new company of $374,000 in cash, 10,100 shares of preferred stock and 10,100 shares of common stock in the new company. This sum of money, I assume, would be the working capital, which, under the letter of March 27th, was to be paid to the new company, and deducted from the proceeds of the sale of the stock of the new company which was to be issued to Hyde in lieu of the 10,100 shares of stock of the old company. The agreement with Taylor & Co. was not absolute, but depended entirely upon an examination of the patents and machinery proving satisfactory to Taylor & Co. Hyde was entitled to receive for the stock of the old company $22.75 per share, amounting to $229,725. He was required to pay in cash to the new company $374,000. Taylor & Co. had agreed to pay for 20,000 shares of stock (10,000 of preferred and 10,000 of common), if things were satisfactory, $750,000, on or before November 1, 1899. Hyde had agreed to purchase the remaining stock in the old company, for which he was to receive stock in the new company at the rate of 1 share of preferred and 1 of common for each share of stock of the old company; and the stock that Hyde was to receive was to be deposited so that it could not be sold or used for one year.

It is clear that, under this agreement, there could be no profits ascertained until the expiration of the year from the date of the Taylor agreement. Whether there would be any profit at all depended first upon whether or not Taylor & Co. would carry out their contract, which was contingent upon the patents and machinery being satisfactory to them, and then upon the price at which the stock that Hyde retained could be sold after the expiration of the year, so that at the time of the conversation between Hyde and the plaintiff there were no profits upon the undertaking to which the plaintiff was entitled. The new company was not then organized, as the date of its organization was May 31, 1899. The plaintiff testified that at that time he knew that Hyde was negotiating with Taylor & Co. for the sale of some of the stock of the new company, such negotiations having been discussed between the plaintiff and Hyde in a general way; and the plaintiff knew that representatives of Taylor & Co. were frequently at the office of the company, and the plaintiff familiarized himself, so far as he could, with what was going on between them and Hyde. The plaintiff also knew that Hyde had employed Mr. E. N. Dickerson, a patent attorney, and had made an agreement with him by which, for services rendered, Dickerson was to have 20 per cent. of the net profits of the transaction, and knew that the new company had not been formed. The plaintiff, with this knowledge, after the agreement with

Taylor & Co. had been executed, saw Hyde, and the plaintiff testified that Hyde said to him, "Now, Spier, I want you to accept ten per cent., instead of fifteen per cent." This the plaintiff objected to, when some discussion followed, and Hyde then said, "Well, the profits of the pool are only about 2,475 shares, and your percentage of that would be 361 and a fraction;" and then Hyde offered the plaintiff 375 shares, which the plaintiff accepted on Hyde's representation that the profits of the pool were only about 2,475 shares. Spier also testified that Hyde said that Taylor & Co. had made other exactions in regard to the shares of stock that they were to purchase, and that this was the basis for the statement that the pool profits would be 2,475 shares of the stock.

Assuming that such a statement was made, it must be apparent that the plaintiff understood that this statement of profits was a mere estimate, based upon what was the expected result of the negotiations with Taylor. The plaintiff knew that no new corporation had been organized. He also knew that under his agreement he was entitled, not to any amount of stock, but to the net profits to be realized by a sale of the stock of the new company received for the 10,100 shares of the stock of the old company after all expenses had been paid, and a working capital had been provided for the new company. The defendant testified that the plaintiff had knowledge of the terms of the contract with Taylor. That the plaintiff denied, but he knew perfectly well that under his contract there could be at that time no statement of the profits, to a percentage of which he was entitled. He also knew that under no condition would he be entitled to any number of shares of the stock of the new company, but only to 15 per cent. of the net profits after all of the stock issued to Hyde in lieu of his 10,100 shares of stock of the old company had been sold. Assuming that the contract with Taylor & Co. was carried out, was it at all certain that there would be any profits upon the final completion of the contract? That would necessarily depend upon the amount that it would cost Hyde to procure the additional stock of the old company, and the amount for which he would be able to sell the stock of the new company after the year had expired, during which time it was to be deposited with the trust company. With the knowledge that the plaintiff had of the transaction, it is clear that the plaintiff did not understand, and could not have understood, that Hyde represented that at that time there was any profit in the transaction to which the plaintiff was then entitled, or that Hyde's statement was anything more than a proposition to accept a certain amount of preferred and common stock of the new company in lieu of the 15 per cent. of the cash profits of the transaction, after all the stock that was issued to Hyde in lieu of the 10,100 shares of stock of the old company had been sold. And that the plaintiff relied upon Hyde's representations that the profit of the pool stock was at that time 2,475 shares, of which he was entitled to receive 15 per cent., when the plaintiff knew that no company had been organized, and was told that Taylor & Co. were negotiating for a purchase of an interest in the company, and had made additional demands for stock, is directly contradicted by the conceded facts. There could be, under the agreement, no profits to the plaintiff at all until

the stock of the new company had been issued and sold, the amount furnished as working capital determined, and the expenses paid; and plaintiff knew all this as well as Hyde knew it. The plaintiff says that, relying upon this representation, he made a contract by which he agreed to accept 375 shares of preferred and 375 of common stock of the new company in the event of the formation of that company, which stock should be in full for his services and all demands under the agreement of March 27, 1899; and the agreement then contained this clause: "This, of course, depends upon the formation of the Goodson Graphotype Company and the carrying out of our plans of reorganization as mentioned to you to-day." This letter expressly states that the stock to be given to the plaintiff was to be stock in a company to be organized, and the form of the understanding which he accepted in writing as perfectly satisfactory to him, and which by such acceptance he adopted, is a clear statement that the agreement to accept this stock was based upon a plan of reorganization to be carried out in the future, which had been discussed between Hyde and the plaintiff; and any statement of the profits of such an arrangement to be carried out in the future would clearly be a statement of estimated or contemplated profits, and not a statement of profits that had been realized or fixed, which could be the basis of a charge of false or fraudulent misrepresentations.

It is clear to me that, accepting this whole conversation as testified to by the plaintiff as true, there is no representation made as to the existence of profits, but a mere statement of what it was contemplated would be the profits if the agreement with Taylor & Co. was carried out, and that the plaintiff could have understood nothing else from the statement that was made by Hyde. But if it be assumed that Hyde did state that the profits of the pool at that time were only about 2,475 shares, there is no evidence that this statement was false. It is clear that it was here intended that the profits would be 2,475 shares of the preferred and 2,475 of the common stock, of which plaintiff would be entitled to 750 shares of each. What Hyde was to receive from the transfer of the 10,100 shares of stock of the old company, and what, as I understand, he did receive, was 10,100 shares of preferred stock and 10,100 shares of common stock. But it was not agreed that the plaintiff should receive 15 per cent. of the stock that Hyde was to receive for the 10,100 shares of the old stock that he transferred to the company. There is certainly nothing in this evidence to show that, after deducting the amount of stock necessary to procure the sums of money required to pay the $22.75 per share, the expenses, and the working capital, there would be any more stock to divide among those who were entitled to the proceeds of the profits realized than that stated by Hyde, if stock instead of cash was to be distributed. There is nothing, therefore, to show, or that tends to show, that at the time this statement was made it was a false statement of the profits, to an interest in which the plaintiff was entitled. Assuming that the plaintiff's story is true, I think the statement made by Hyde was necessarily made as an estimate of what the profits would be in the future if the transaction was carried out, that it was so understood by the plaintiff, that there is no evidence that at that time that statement was false,

and that the finding of the court that the agreement of May 8, 1899, was induced by fraud was unsupported by the evidence; and for that reason the judgment should be reversed.