McCORMICK, Circuit Judge.
In 1890, Albert L. Rice was president of a projected railroad in Florida, called the “Gainesville, Tallahassee & Western Railroad.” He and others interested with him saw in the New York World a notice stating that Christopher W. McLean, of Toledo, Ohio, had just met with great success, and made a large amount of money, in building the first electric railroad in that city. Mr. Rice thereupon opened correspondence with Mr. McLean, which resulted in the latter visiting Florida in the month of March, 1890, and entering into business arrangements with the projectors of the above-named railroad. Soon thereafter Mr. McLean had *855 negotiations with Mrs. E. J. H. Richardson, of Detroit, Mic-h., which ripened into an agreement evidenced by this memorandum in writing, duly executed by them, respectively:
“This memorándum of agreement, made and entered into between Mrs. ID. J. H. Richardson, of Detroit, Michigan, and O. W. McLean, of Toledo, Ohio, this 30th day of April, 1890, viz.: Whereas, O. W. McLean is about to enter into a contract to build a land-grant railroad in the state of Florida, from Gainesville to Tallahassee, and to such other points as he may think best, or to purchase any railroad now constructed or under construction, and one hundred thousand dollars is needed for such purchases, survey, and construction before the railroad can be bonded to continue construction, the said Mrs. E. J. H. Richardson has this day paid O. W. McLean the sum of thirty thousand dollars on account of this agreement, and hereby authorizes G. W. McLean to use this first thirty thousand dollars to buy phosphate, timber, and other lands, lots, town sites, or to obtain option on same, and to use this money, using his own discretion in investing this money as he may desire, hoping thereby to receive some portion of the hundred thousand dollars needed to prepare railroad for bonding. G. W. McLean does hereby agree to obtain life insurance on his life for the benefit of Mrs. E. J. H. Richardson, to cover whatever amount is paid by her to him, in order that, in case of his death, she will be able promptly to secure amount of money or moneys so advanced by her, as much depends on the life of G. W. McLean to bring this matter to its fullness. It is further understood and agreed that the net profits made in all and each transaction mentioned in this agreement are to be divided equally, share and share alike, between Mrs. E. J. H. Richardson and O. W. McLean, Mrs. Richardson furnishing the money mentioned in this agreement, C. W. McLean being responsible for one-half the amount advanced by Mrs. E. J. H. Richardson.”
Some difficulty arose with the minority stockholders in the Florida railroad project, attended with litigation and delay, pending which McLean directed his attention to dealing in phosphate lands, of which then and later he acquired considerable quantities, taking title in his own name, generally without alluding to any other beneficial ownership, but in a few instances taking the title to himself as trustee, without any further declaration of the trust. . When matters had progressed for something more than a year, further negotiations between McLean and Richardson ripened into a second agreement, evidenced by a written memorandum duly executed by them, as follows:
“Whereas, in the month of April, 1890, G. W. McLean, of Toledo, Ohio, and Mrs. E. J. H. Richardson, of Detroit, Michigan, entered into an agreement or partnership, wherein Mrs. E. J. H. Richardson was to furnish money for buying phosphate, timber, and other lands, town and city lots; buy, sell, or lease railroads, or build them in or out of the state of Florida; sell or operate railroads, or mine phosphate, or to form phosphate companies, one or more; buy and sell real estate and other properties in Ohio, Florida, or other states: It is understood and agreed that both are to share, and share alike, in all profits, whether in money, stocks, or bonds, land, city and town lots (whether they may prove to be phosphate or mineral lands or not), railroad lands or terminals, or interests in harbors or seaports; also the Red Sulphur Spring near Old Town, on the Suwannee river, in the county of Lafayette, state of Florida; in fact, to share, and share alike, in the net proceeds of all business by C. W. McLean for five years from the date of this instrument. The said Mrs. E. .T. H. Richardson having contributed fifty thousand dollars in cash at various times, for which C. W. McLean has given his receipts, and has loaned to the company or co-partnership, at various times, stock in the Diamond Match Company, of Chicago, which stock is to be returned to the said Mrs. Richardson as soon as it can be safely done, and will not cripple the operations of said McLean, said C. W. McLean has placed in the hands *856 of Lobdell, Farwell & Co., of Chicago, Illinois, sixty thousand dollars, par value, for which receipts have been given, on which he has borrowed sixty thousand dollars, and has also received fifty-four thousand dollars, par value, and this day, 8th of July, forty-two thousand more of said stock, viz.:
$60,000 in Lobdell, Farwell & Co., Chicago, 111..
54.000
42.000
$156,000, par value,
—<0. W. McLean still having fifty-four thousand’ on hand, and forty-two- this: day delivered to him; C. W. McLean having obtained a temporary loan on eighteen thousand dollars of said fifty-four thousand, of ten thousand five hundred dollars, which said Mrs. Richardson received this 8th day of July, 1891, the receipt of which is hereby acknowledged. The said C. W. McLean is to obtain a loan as soon as possible for twelve thousand dollars, which, when done, Mrs. Richardson is to deliver said C. W. McLean the further sum of fifty-six thousand (par value) of Diamond Match stock, and said McLean to remit said Mrs. Richardson the further sum of thirty thousand dollars. The remainder of the stock to be used by said McLean as he thinks best, for the mutual advantage of both parties, and to be returned when it can be done without injury to the enterprises on hand by C. W. McLean. It is further agreed by C. W. McLean that, as soon as the certificate of stock is issued in the Gulf Stream Phosphate Company, of Florida, the company will send or deliver to said Mrs. Richardson four hundred thousand dollars of said stock, and also same out of Construction Company stock; also eight hundred thousand dollars of the stock of the Florida, Georgia & Western Railroad. All the above stocks are full paid and nonassessable. The above stocks all to be delivered to said Mrs. Richardson as soon as engraved, signed, and sealed. It is further agreed by C. W. McLean that in case of the death of said C. W. McLean, and any loss should be sustained by Mrs. Richardson in consequence of death or otherwise, that the interest of said C. W. McLean in the above properties and stocks shall be sold as soon as possible, without sacrifice, to pay said E. J. H. Richardson in full, with interest. It is further agreed that, when Mrs. E. J. H. Richardson desires to sell the Diamond Match stock pledged for our mutual interests, she is empowered to take up said stock at any time she thinks best to do so. It is further agreed that, in case of death of either party, the business is to be carried on for the benefit of whom it may concern for the full term of five years. C. W. McLean.
“Detroit, Mich., July 8th, ’91. E. J. H. Richardson.”
About December 1, 1891, the enterprises as conducted by McLean began to need urgently further funds than he had in hand. Mrs. Richardson had advanced all the capital she- conveniently could, or, at least, was willing to put into the enterprises, and McLean had to look to other sources for raising money to save from forfeiture and from seizure of creditors the property already acquired. About December 12, 1891, he began getting money from Nathan C. Pond. Mrs. Richardson began to be restless under her disappointment in not getting the promised and expected returns from her investments with McLean, and still further negotiations were had between the partners, the result of which is expressed in a third written memorandum, in the following terms:
“It Is understood by and between Mrs. E'. J. H. Richardson and C. W. McLean that Mrs. Richardson redeed to him property purchased of him in November last, he returning the mortgages canceled, in what is known as the ‘Glassboro Addition,’ in Toledo, Ohio, and to free her in the purchase of the Windsor Hotel of Mary Wolf Van Hamm, provided she (Mrs. Richardson) sign release herself. O. W. McLean is to go on with the construction of the Florida, Georgia & Western Railroad, laying ten miles of track, grading and tieing forty miles, in order to secure the first land grant, and to do this as *857 soon as possible on or before four months. Said McLean to renew notes with Lobdell, Farwell & Oo., on Diamond Match stock, par value of stock being $212,000, until it is returned to her. It is further understood and agreed that Mrs. Richardson is to have one-half of the stock in the Florida, Georgia & Western Railroad, half the stock in the Interstate Land Construction Company, and one-half the stock in the Gulf Stream Phosphate Company,—all of the state of Florida. She already having two-fifths of the stock of the railroad and two-fifths of the stock of the Interstate Land Construction Company, she therefore is to receive one-tenth more in each of these companies. In the Gulf Stream Phosphate Company she has not received any, but is to receive one-half. These stocks are to be issued to her Just as soon as the companies can be reorganized, and no delay beyond the necessary delay of doing this. It is further understood and agreed that said Mrs. Richardson is in no way to interfere with my operations, or this contract is null and void. It is further agreed that I, C. W. McLean, agree to deed the phosphate lands that stand in my name at this date to the Gulf Stream Phosphate Company as soon as organized, without any unnecessary delay.”
McLean continued from time to time to get money from Nathan G. Pond, to whom he transferred, December 14, 1891, two policies of insurance on McLean’s life; and on April 2, 1892, he deeded to Louis K. Pond, the son of Nathan G. Pond, a considerable amount of the Florida lands theretofore acquired. The policies of insurance and the lands deeded to Louis K. Pond were subsequently conveyed to Sarah E. Pond, who was the wife of Nathan 0. Pond, and the mother of Louis K. Pond. In connection with the Florida enterprises, McLean had dealings with James M. Mayo, Sidney I. Wailes, and John O. Daves.
On March 27, 1893, the complainant, E. Jennie H. Kichardson, exhibited her bill against Christopher W. McLean, Nathan 0. Pond, Louis K. Pond, Sarah E. Pond, James M. Mayo, Sidney I. Wailes, and. John C. Daves. To this bill, only Nathan C. Pond, Sarah E. Pond, and Louis K. Pond answered. They filed a joint and several answer. The issues as to all the other defendants were found in favor of the complainant by the decree of the circuit court, and there is no complaint of so much of that decree. In reference to the defendants, who answered, the bill charges as follows:
“That the said defendant McLean, in violation of said agreements with your-said oratrix, and in violation of his said trust, has purported to convey or mortgage to the defendants Louis IÍ. Pond or Sarah E. Pond certain portions of said trust lands above mentioned, purchased as aforesaid with the funds of your oratrix, or with funds procured by said McLean upon her stocks as collateral, as aforesaid. Said portions of said lands so conveyed or mortgaged to said defendants Louis I-C. Pond or Sarah E. Pond, or one of them, are described as follows, to wit: * * *. That your oratrix charges and: alleges that the said transaction between the said McLean and the said Ponds was a loan from the said Ponds, or one of them, or from one Nathan O. Pond to the said McLean, the exact amount of which your oratrix cannot state-without discovery from the said defendants; but she charges and alleges that the same was not more than the sum of twenty thousand dollars, and the-defendants should be required to make discovery of the true amount so paid by the said Ponds, or either of them, to said McLean. Your oratrix further-charges and alleges that any deed or deeds executed by the said defendant McLean to the said Louis K. Pond, or to the said Sarah E. Pond, were intended to secure the repayment of a loan of money made by the said Ponds, or one of them, or Nathan C. Pond, to the said McLean; and any such deed or-deeds are, in law and equity, mortgages subject to redemption, and do not convey to the said Ponds, or either of them, the complete title in fee in and to said lands described in said deed or deeds. That at the same time that--. *858 tbe said mortgages, deed, or deeds were executed by said defendant BIcLean to said defendants Ponds, and at tbe same time that tbe said money, if any, was paid by tbe said defendants Ponds to tbe said defendant McLean, they or Natban C. Pond obtained from him, and be assigned to them, or one of them, certain policies of insurance upon his life, as additional security to secure tbe repayment to them, or one of them, of tbe money so advanced by them, tbe said Ponds, to bim; thus evidencing that tbe true nature of tbe transaction between the said Ponds and tbe said McLean was a loan of money by them to him, for which he was giving them security upon said lands and upon said life insurance.”
The prayer of the bill, as against the defendants Pond, is as follows:
“That an accounting be bad of what amount, if any, was paid or advanced by defendants Louis K. Pond or Sarah E. Pond or Nathan C. Pond to the' •defendant BIcLean, and that tbe deed or deeds from the said BIcLean to said defendants Ponds or either of them, be decreed to be mortgages, and they be decreed to hold the title to said property in trust for your oratrix, in place and stead of said BIcLean, as trustee, or on payment to them by your oratrix of the amounts found paid by them to the defendant BIcLean; that they be decreed to convey and transfer to your oratrix the title to said lands so conveyed to them by defendant BIcLean, and to assign and transfer to your oratrix any and all insurance policies upon tbe life of said BIcLean, or other securities transferred to them by said defendant BIcLean.”
On the issues joined between the complainant and the defendants Pond, the circuit court decreed as follows:
“It is further ordered, adjudged, and decreed that the deeds from the said •defendant BIcLean to defendant Louis I-C. Pond * * * were, in effect, mortgages only upon said lands, given to secure the defendant Nathan C. Pond for moneys advanced to said defendant McLean by said defendant Natban C. Pond, prior to tbe 24th day of May, 1892, for the purpose of carrying on tbe enterprises mentioned in tbe contracts (Exhibits A, B, and C) between said complainant and said defendant BIcLean; and. that said Louis K. Pond held said mortgages for and on account of moneys loaned and obligations incurred by said defendant Natban 0. Pond and Louis IC. Pond, without any personal interest, right, or title thereto in said Louis K. Pond, except as aforesaid. * * * It is further ordered, adjudged, and decreed that this cause be referred to Francis P. Fleming as a special master in chancery, for the purpose of taking proofs, and stating the account, of the amount of .such advances and loans and obligations made by said Nathan O. Pond and Louis IC Pond to the defendant Christopher W. McLean, prior to the 24tfi •day of Blay, 1892, for the purpose of carrying on the enterprises embraced in the contracts (Exhibits A, B, and C) between complainant and said defendant McLean above mentioned, and taxes on said lands; and that, in taking said .account, the said master shall deduct from the amount of any such advances tbe sum of 810,000, received by tbe said defendants Ponds, or either of them, from tbe surrender of two certain life insurance policies held by them upon the life of said Christopher W. BIcLean, as security for said advances [with •directions as to allowing interest].”
The master took testimony, ,and stated the account, as required by the reference, and, by his report, showed a balance due Nathan C. Pond, or his assigns, on February 3, 1896, of $35,877.83, which, with interest up to the date of the decree, July 28, 1896, amounted to $36,924.27, in addition to which an amount of $657.43, for taxes paid by Sarah E. Pond, and interest thereon to date of the final decree, were found by the final decree to be a charge on the lands in question, which lands, it was adjudged, should be reconveyed by said Nathan •C. Pond, Louis K. Pond, and Sarah E. Pond to the complainant upon her payment of the charges above fixed, or, in the event of such pay *859 ment being made, and the failure to convey, tbe decree was to operate with the same force and effect as such conveyance; “and, upon the failure to make such payment within six months, said right of redemption shall be considered forfeited.”
As we construe the record in this case, the interlocutory decree entered April 15, 1895, found every issue made by the complainant’s bill in favor of the complainant, and a careful examination of the testimony satisfies us that the directions given by the judge of the circuit court to the special master for stating the account were such as the case required, and appear to have been satisfactory at the time to all the parties, or at least were acquiesced in by all. Thereafter a large amount of proof was taken before the master. Much of it received by the master, subject to objections made at the time by counsel for the defendants, was impertinent to the investigation the master was charged to make, and was doubtless disregarded, as it should have been, by the judge of the circuit court when he came to act upon the complainant’s exceptions to the master’s reports. After a laborious and careful examination of the record in this case, we find nothing that would justify us in coming to a different conclusion than that expressed in the decree appealed from. It appears to us to be a case presenting only questions of fact. There seems to be no dispute between the parties (and there could hardly be) as to the law applicable to the case made by the bill and answer and proof. The decree of the circuit court, therefore, is affirmed.