[No. 1871]

# H. B. LIND AND GEORGE L. KAEDING, APPELLANTS, v. W. H. WEBBER, JOHN T. HODSON, JAMES R. DAVIS, AND NEVADA HILLS MINING COMPANY (A CORPORATION), RESPONDENTS.

1. JOINT ADVENTURES—MUTUAL RIGHTS—PROPERTY ACQUIRED.

Four individuals entered into an agreement to send W., one of their number, to examine a new mining district and locate any valuable rights; the expenses of the trip to be shared equally by the parties. W. located four claims in the name of one of the other parties to the agreement. On the trip he met other miners, and after his return he terminated the agreement, and on the same day and without consideration he secured for himself and one of the other parties to the joint agreement, from those whom he had met on the trip, interests in some claims which they had located while all were together. *Held*, that the other two parties to the joint agreement were entitled to share in the profits from the claims so acquired through the examination and trip made under the joint agreement.

2. JOINT ADVENTURES—MUTUAL RIGHTS—INTENTION OF PARTIES.

Even though W. believed that he had a right to terminate the agreement and thereafter to acquire for himself interests which he had examined on the trip, equity will not permit him to deprive his associates of their share of whatever he acquired as a result of that trip.

3. JOINT ADVENTURES—TERMINATION OF AGREEMENT—EFFECT.

Since the joint agreement specified no time for its continuance, W. had a right to terminate it upon his return from the trip, and any rights acquired as a result of the subsequent trips would be his alone; but the termination did not affect rights acquired as a result of the trip made under the joint agreement.

4. JOINT ADVENTURES—RIGHTS OF PARTIES—FAILURE TO CONTRIBUTE.

Where, except for temporary advances, the proceeds from the claims acquired by W. as a result of his trip under the joint agreement were sufficient to acquire adverse interests and develop the property, the other parties to the joint agreement did not lose their right to share in the profits by their failure to contribute to such advances for which no demand was ever made upon them.

5. JOINT ADVENTURES—ACTIONS BETWEEN PARTIES—ACCOUNTING— LACHES.

Where the other parties knew in a general way that W. was interested in some other claims in that mining district, but did not know the circumstances under which he had acquired that interest, their delay in instituting a suit for an accounting did not amount to laches.

6. Costs—Motion for Retaxation.
Where plaintiffs filed and served a notice of motion to retax costs two days after the entry of judgment, it was error to sustain an objection to the hearing of the motion, because no "motion" had been filed within two days after the entry of judgment.

### SUPPLEMENTAL OPINION ON COSTS

1. Costs—Remedies for Erroneous Taxation—Motion to Retax.
Under rule 34, providing that the party against whom judgment is entered shall have two days after service of a copy of the cost bill in which to move to retax costs, a notice of motion to retax, filed and served within two days after service of the cost bill, was sufficient, without actually filing and making in court within that time a motion to retax.

2. Costs—Remedies for Erroneous Taxation—Motion to Retax.
Under rule 34, providing that the party against whom judgment is entered shall have two days after service of a copy of the cost bill in which to move to retax, if defendant felt aggrieved because a hearing for a motion to retax was noticed for the second Saturday instead of the first thereafter, he should have applied to the lower court to shorten the time.

APPEAL from the Seventh Judicial District Court, Esmeralda County; *Theron Stevens*, Judge.

Action by H. B. Lind and George L. Kaeding against W. H. Webber, John T. Hodson, James R. Davis, and Nevada Hills Mining Company (a corporation). Judgment for defendants; from the judgment and from an order dismissing plaintiffs' motion to retax costs, plaintiffs appeal. **Reversed.** Petition for a rehearing pending.

The facts sufficiently appear in the opinion.

*Bryant & O'Brien* and *H. B. Lind*, for Appellants.

*R. G. Withers*, for Respondents.

By the Court, TALBOT, C. J.:

This case is based on an agreement for locating and acquiring mining claims. In the extended and carefully prepared briefs a number of questions relating to conflicting evidence and interesting propositions of law have been presented, which under our view we need not determine. From the findings of the court, which are as favorable to respondent as the conflicting testimony will warrant, and from the undisputed evidence

sufficient facts appear to enable us to reach a conclusion as to the ultimate rights of the parties.

At Goldfield, on the 3d day of February, 1906, the plaintiffs and the defendants Webber and Davis entered into an agreement that Webber should make a trip into the Fairview mining district in Churchill County, where a new find of mineral had been reported, for the purpose of examining the district and acquiring by location, option, or otherwise any mining rights which might be deemed of value. Each of the parties was to pay one-quarter of the expense, and Webber was to make no charge for his time or services. This agreement was made on the solicitation of Lind, upon his telling Webber and Davis about information which he had obtained from a friend regarding a rich assay of float from that recently discovered mining district. It is said that Webber also had information or had heard rumors regarding the new discovery.

The plaintiffs caused to be furnished to Webber money, blankets, and other things for the trip. In pursuance of the agreement, Webber left Goldfield on February 4, 1906, and went to the Fairview district. On the same train by which Webber left Goldfield were George Bethune and the defendant Hodson, who were going to the Fairview district under a contract made by them with W. H. Clark and J. A. Kirby. Webber, Hodson, and Bethune went from Hazen to Fairview in the same conveyance, bought their provisions together, stayed over at Sand Springs, where separate locations were made, went into Fairview, and remained together throughout the trip.

Shortly after arriving at Fairview, Hudson and Bethune, without stopping to prospect, located on ground which had been pointed out to them as being vacant the Lookout group, consisting of eleven or twelve locations, the Mountain Sheep, and other claims. While they were making these locations, Webber was prospecting in the vicinity, and, after the Silver Butte claim had been located by Hodson and Bethune, Webber discovered on it a small mineralized vein, and, after endeavoring to determine its character and strike, Hodson, at the request

of Webber, located in the name of Lind four claims known as the Silver Bow group. The other claims were located in the names of Hodson and Bethune. No mineral outcrops were discovered upon the Silver Bow claims or upon the Hodson and Bethune locations, except the vein discovered by Webber on the Silver Butte. Directly after locating these claims, Webber and Hodson left Bethune at Fairview and returned to Goldfield together, taking with them samples of rock, and reached there on the 14th day of February, 1906.

Upon his arrival, Webber reported to the plaintiffs, and presented a statement of the expenses of the trip, amounting to $90, one-half of which, less the amount which they had advanced on his departure, was paid by the plaintiffs and a receipt taken. Upon the day of his return to Goldfield, Webber had conferences with Davis, Clark, Kirby, and Hodson, and on the following day, without payment of any consideration, they executed a written agreement that all claims theretofore located in the Fairview mining district by Hodson and Bethune, or that might be thereafter located or acquired in that district, should be owned by these parties jointly, and that Webber and Davis should each have an equal interest therein with Hodson, Kirby, and Clark. On the same day an agreement in writing was executed between those parties and W. B. Rice, which created a new partnership by them, and by which it was agreed that an undivided one-sixth interest in the mining claims located in the names of Hodson and Bethune should be sold to Rice for the sum of $5,000, provided that the interest of Bethune in these claims could be acquired for a sum not to exceed $2,500. If his interest could be so acquired, the remainder of the $5,000 was "to be spent in improvement and perfecting of titles of the properties or for acquiring additional ground or options on additional ground as might be deemed advisable." Further provision was made in the agreement that Hodson and Webber should act for and represent the interests of the parties to the agreement.

In compliance with the agreement, Rice on that day paid the sum of $5,000 for a one-sixth interest in the mining claims which had been located in the names of Hodson and Bethune, and the money was delivered to Hodson, who was authorized by his associates in the agreement to return to Fairview and acquire the interest of Bethune in the mining claims, which he did for the sum of $1,500.

For the appellants it is said that Bethune's interest was so acquired by concealing from him the formation of the new partnership and the payment of the $5,000 by Rice for a one-sixth interest in the claims, and by stating that the assays from the samples taken were low, and that Clark and Kirby refused to proceed further with the properties which had been located. Webber left Goldfield for Fairview a day or two after Hodson had left, and after the purchase of Bethune's interest they went together from Fallon to Fairview and began the work of perfecting the locations which had been made on their first trip.

The Lookout claims covered a portion of the Boulder and Boulder No. 1 claims, prior locations, and on March 14 an option was secured on the Boulder and Boulder No. 1 for $5,000, and final payment was made for them on April 12. A part of the money received from Rice, remaining after the payment of the $1,500 to Bethune for his interest and the payment of certain expenses, was used in the purchase of the Boulders. The defendants and their associates in the agreement last mentioned, under a contract dated April 16, sold to one Sherman and received for a portion of the Lookout group the sum of $50,000; the first payment of $5,000 being made on April 19, seven days after the final payment on the Boulders. The remainder of the $50,000 they divided equally among themselves, Webber, and Davis, each receiving one-sixth. They transferred to the Pyramid Mining Company a portion of the claims, for which they received and divided equally between them 700,000 shares of the capital stock of that company. Another portion of the claims, with

the interest in the Boulder and Boulder No. 1, which lapped and adjoined, they conveyed to the Nevada Hills Mining Company, and received therefor, and likewise divided, 700,000 shares of its capital stock, and Webber and Davis each received $50,000 in dividends upon their proportion of the stock of that company.

After Rice had paid the $5,000, and after the options had been secured on the Boulders, Davis, on the last of March, 1906, gave a check for $2,000, and Kirby and Clark advanced certain moneys about that time. These advances to the partnership were only temporary, for, as stated, the payment was made by Sherman nineteen days later, and seven days after the money was actually used for the final payment on the Boulders. The plaintiffs were not notified regarding these transactions.

Webber completed the locations of the Silver Bow group after he returned to Fairview, and the cost of the work was paid by plaintiffs and Webber and Davis. Later the Fairview Aztec Mining Company was incorporated to take over the Silver Bow group of claims, and Webber and Davis received their share of the stock of the company.

No demand was made upon plaintiffs for any money, except for their proportion of the expenses incurred by Webber on his first trip to Fairview and on the claims located in the name of Lind, which were conceded to belong to him, Webber, Davis, and Clark, or which they did not pay; nor does it appear that they were informed that any money was needed which they did not advance, or that until a short time before the commencement of this action they were aware that, without making any payment therefor, Webber and Davis had acquired each a one-sixth in the claims located by Hodson and Bethune, or that money or stock acquired through the location of those claims, and moneys and stock derived from sales and transfers thereof, had been received by Webber and Davis.

Under the conflicting evidence the district court finds against the contentions of the plaintiff that the first

agreement made by the plaintiffs and Webber and Davis was one creating a general mining partnership, and against the claim of the plaintiffs that there was a secret understanding between Webber and Hodson in advance of their return to Goldfield that Webber should have an interest in the claims located in the names of Hodson and Bethune, and the court found in favor of the contention of the defendants that the original agreement, under which Webber went to Fairview, was terminated upon the payment of the expenses of the trip upon his return to Goldfield.

1. Notwithstanding the findings of the district court, we are of the opinion that under the conceded facts and under equitable principles and the decisions of this court that, regardless of whether the original agreement made by the plaintiffs and Webber and Davis be considered as one constituting a partnership, or only as providing for a joint venture, or in the nature of a grubstake agreement, as held by the court, and regardless of whether there was any fraudulent or secret understanding between Hodson and Webber before they returned to Goldfield, and regardless of whether the agreement of the plaintiffs was terminated upon the payment by them of their portion of the expenses of Webber's trip, the plaintiffs are entitled to have an accounting and to recover from the defendants Webber and Davis one-half of whatever Webber and Davis have acquired from the Fairview mines, stocks, and properties under the transactions mentioned, in which they were interested with Hodson, Rice, Kirby, and Clark. We come to this conclusion because it is apparent that Webber and Davis acquired their interests in the mines, stocks, and moneys mentioned as a result of the first trip of Webber to Fairview, and by reason of his examination, prospecting, and knowledge acquired on that trip, which was proposed by Lind and paid for in part by the plaintiffs under their agreement with him and Davis.

After Webber had been sent to Fairview by and at the expense of plaintiffs and Davis to locate and acquire

claims for the benefit of the four, it would be inequitable to hold that he could return, cancel his agreement with the plaintiffs for the purpose of eliminating them, and the next day, without consideration, acquire for himself or his favorite associate in the agreement, and to the exclusion of his other associates in the agreement, an interest in the property which he had examined, prospected, and ascertained to be valuable on a trip made for the purpose of acquiring jointly property of that very nature, without first fully informing the plaintiffs and giving them an opportunity to share or to decline to join in the acquisition of an interest therein. The same principle would apply if Webber or Davis had sent any one out under an agreement to locate or acquire claims for a joint interest or as an agent for salary, and after discovering valuable ground he had returned without locating or securing it by option and canceled his agreement or severed his agency for the purpose of eliminating them, and then had gone out into the field and acquired the property for himself or others.

2. Notwithstanding any intention or belief of the agent that he might have a right to do this, equity will not permit him to use the knowledge so acquired to deprive the principal or associates for whom he was sent out to act of their share of whatever may be acquired.

3. As no definite time was specified for the continuance of the original agreement made with plaintiffs, Webber was at liberty to terminate it upon his return to Goldfield; but he could not thereby deprive the plaintiffs of rights resulting from that trip and from the expense incident, a proportion of which they had borne. He would have been free to discontinue the agreement with them and to have gone to Fairview or elsewhere and secure properties by location or purchase if he did not acquire them by reason of his examination and knowledge obtained and what transpired on his first trip there, or for the purpose or with the result of depriving the plaintiffs of an interest in such property as he had been sent out to secure for them jointly.

**4.** Plaintiffs are not without right of recovery because of their failure to contribute a portion of the $5,000 paid for the Boulders or the $2,000 paid for other conflicting or lapping claims—the Florences—when more than the necessary money to meet these payments was directly received from the sale of a portion of the claims to Rice and Sherman, and when plaintiffs were not made aware of the conditions or that any money was needed. The case is quite different from the one of *McKenzie* v. *Coslett*, 28 Nev. 65. Evidently the defendants knew from the beginning that the property was of high value. If with doubtful results defendants had advanced large sums of money, which was not derived from the property, for securing conflicting claims or for development work, and the plaintiffs, after knowledge of the conditions and payment made, had refused to contribute their proportion, a different question would be presented for determination.

**5.** Nor do we find that the plaintiffs have lost any rights by laches. Although they were aware in a general way that Webber had become associated with the other parties at Fairview, they were without information of the particular facts on which their right of recovery depends, such as the ones indicated showing that Webber and Davis, without paying anything therefor, had on the day after his return from Fairview acquired, through the knowledge obtained and association on the trip, an interest in property which he had assisted in locating or prospecting when he was acting at the joint expense and for the joint benefit of the plaintiffs and Webber and Davis.

In *Botsford* v. *Van Riper*, 33 Nev. 191, we said: "The law is well established that property purchased or acquired in connection with a joint adventure or profits realized from a joint adventure of the joint property of the parties interested, where one party holds title to the same, that such property is held in law to be the property of his associates, and the party holding the same is holding their proportionate share as trustee for them.

(23 Cyc. pp. 455-459; *Hayden* v. *Eagleson*, 15 N. Y. St. Rep. 200; *Fueschsel* v. *Bellesheim*, 14 N. Y. St. Rep. 610; *Richardson* v. *McLean*, 80 Fed. 854, 26 C. C. A. 190; *Morris* v. *Wood*, 35 S. W. 1013; *Lyles* v. *Styles*, 15 Fed. Cas. 1143, No. 8,625; *Cunningham* v. *Davis*, 47 S. W. 140; *Matthews* v. *Kerfoot*, 64 Ill. App. 571; *Jones* v. *Davis*, 48 N. J. Eq. 493, 21 Atl. 1035; *Spier* v. *Hyde*, 92 App. Div. 467, 87 N. Y. Supp. 285; *Calkins* v. *Worth*, 215 Ill. 78, 74 N. E. 81; *Putnam* v. *Burrill*, 62 Me. 44; *McCutcheon* v. *Smith*, 173 Pa. 101, 33 Atl. 881; *Getty* v. *Devlin*, 54 N. Y. 403; *Church* v. *Odell*, 100 Minn. 98, 110 N. W. 346; *Knapp* v. *Hanley*, 108 Mo. App. 353, 83 S. W. 1005; *Hancock* v. *Tharpe*, 129 Ga. 812, 60 S. E. 168; *Reilly* v. *Freeman*, 1 App. Div. 560, 37 N. Y. Supp. 570; *Marston* v. *Gould*, 69 N. Y. 220; *Humburg* v. *Lotz*, 4 Cal. App. 438, 88 Pac. 510; *Williams* v. *Love*, 2 Head, Tenn. 80, 73 Am. Dec. 191; *King* v. *Wise*, 43 Cal. 628.) We further find that the law is well established that the relation between joint adventurers is fiduciary in its character, and the utmost good faith is required of the trustee, to whom the deal or property may be intrusted, and that such trustee will be held strictly to account to his coadventurers, and that he will not be permitted, by reason of the possession of the property or profits, whichever the case may be, to enjoy an unfair advantage, or have any greater rights in the property, by reason of the fact that he is in possession of the property or profits as trustee, than his coadventurers are entitled to. The mere fact that he is intrusted with the rights of his coadventurers imposes upon him the sacred duty of guarding their rights equally with his own, and he is required to account strictly to his coadventurers, and if he is recreant to his trust, any rights they may be denied are recoverable. (23 Cyc. 455; *Cole* v. *Bacon*, 63 Cal. 571; *Hambleton* v. *Rhind*, 84 Md. 456, 36 Atl. 597, 40 L. R. A. 216; *Seehorn* v. *Hall*, 130 Mo. 257, 32 S. W. 643, 51 Am. St. Rep. 562; *Scudder* v. *Budd*, 52 N. J. Eq. 320, 26 Atl. 904; *Getty* v. *Devlin*, 54 N. Y. 403; *Hollister* v. *Simonson*, 18 App. Div. 73, 45 N. Y. Supp. 426; *Reilly* v. *Freeman*, 1 App. Div.

560, 37 N. Y. Supp. 570; *Delmonico* v. *Roudebush,* 5 Fed. 165; *Morris* v. *Wood,* 35 S. W. 1013; *Knapp* v. *Hanley,* 108 Mo. App. 353, 83 S. W. 1005; *O'Hara* v. *Harman,* 14 App. Div. 167, 43 N. Y. Supp. 556; *Calkins* v. *Worth,* 215 Ill. 78, 74 N. E. 81; *King* v. *Wise,* 43 Cal. 628.) * * * Money advanced by one party to a joint adventure is held to be a loan to the venture, for which the party is entitled to be reimbursed out of the proceeds of the venture; but, by reason of the advancing of such money, it does not entitle the party so advancing to any superior right as against his coadventurers. (23 Cyc. 457, 458; *Boqua* v. *Marshall,* 88 Ark. 373, 114 S. W. 714; *Thurston* v. *Hamblin,* 199 Mass. 151, 85 N. E. 82; *Stone* v. *Wright Wire Co.,* 199 Mass. 306, 85 N. E. 471; *Burhans* v. *Jefferson,* 76 Fed. 25, 22 C. C. A. 25; *Sanguinett* v. *Webster,* 153 Mo. 343, 54 S. W. 563; *Woodward* v. *Holmes,* 67 N. H. 494, 41 Atl. 72; *Leamy* v. *Fisler,* 52 Atl. 703; *Rankin* v. *Black,* 1 Head, Tenn. 650; *Crenshaw* v. *Crenshaw,* 61 S. W. 366, 22 Ky. Law Rep. 1782; *Williams* v. *Love,* 2 Head, Tenn. 80, 73 Am. Dec. 191; *Gee* v. *Gee,* 2 Sneed, Tenn. 395; *Withers* v. *Pemberton,* 3 Cold. Tenn. 56; *Furman* v. *McMillian,* 2 Lea, Tenn. 121; *Finlay* v. *Stewart,* 56 Pa. 183; *Stover* v. *Flack,* 30 N. Y. 64; *Doane* v. *Adams,* 15 La. Ann. 350; *Bell* v. *McAboy,* 3 Brewst. Pa. 81.) The law is also well established that, in the absence of an express agreement, the law implies an equal division of the profits of a joint adventure without regard to any inequality of contribution. (23 Cyc. 459; *Wetmore* v. *Crouch,* 150 Mo. 671, 51 S. W. 738; *Knapp* v. *Hanley,* 108 Mo. App. 353, 83 S. W. 1005; *Van Tine* v. *Hilands,* 131 Fed. 124; *Jones* v. *Davis,* 48 N. J. Eq. 493, 21 Atl. 1035.) * * * It is also well settled in law that one party to a joint adventure may sue the other at law for the breach of the contract, or share of the profits or losses, or a contribution for advances made in excess of his share; but the remedy at law does not preclude a suit in equity for an accounting. In this state, under our code of procedure, the district court in proper cases may administer both legal and equitable relief. (23 Cyc. 453–461; *Boqua* v. *Marshall,* 88 Ark. 373, 114 S. W.

714; *Reilly* v. *Freeman*, 1 App. Div. 560, 37 N. Y. Supp. 570; *Petrie* v. *Torrent*, 88 Mich. 43, 49 N. W. 1076; *Spier* v. *Hyde*, 92 App. Div. 467, 87 N. Y. Supp. 285; *McElroy* v. *Swope*, 47 Fed. 380; *Edson* v. *Gates*, 44 Mich. 253, 6 N. W. 645; *King* v. *Barnes*, 109 N. Y. 267, 16 N. E. 332; *Bradley* v. *Wolff*, 40 Misc. Rep. 592, 83 N. Y. Supp. 13; *Marston* v. *Gould*, 69 N. Y. 220; *Kirkwood* v. *Smith*, 47 Misc. Rep. 301, 95 N. Y. Supp. 926–929; *Jones* v. *Davis*, 48 N. J. Eq. 493, 21 Atl. 1035; *Scudder* v. *Budd*, 52 N. J. Eq. 320, 26 Atl. 904; *Humburg* v. *Lotz*, 4 Cal. App. 438, 88 Pac. 510; *Flower* v. *Barnekoff*, 20 Or. 132, 25 Pac. 370, 11 L. R. A. 149; *Corbin* v. *Holmes*, 154 Fed. 593, 83 C. C. A. 367; *McMullen* v. *Hoffman*, 75 Fed. 547.) * * * We do not believe there is any merit in the contention of appellant that the court erred in making an accounting of the amount expended, and in deducting the same from the amount found to be due plaintiffs, as the law applicable to the rules of partnership applies to joint adventures, and, in suits between partners for amounts due them, accountings are always allowed in an action of this character. The rules and principles of the doctrine of partnership apply generally to the relation of joint adventure. (*Church* v. *O'Dell*, 100 Minn. 98, 110 N. W. 346; *O'Hara* v. *Harman*, 14 App. Div. 167, 43 N. Y. Supp. 556; *Marston* v. *Gould*, 69 N. Y. 220; *Wilcox* v. *Pratt*, 125 N. Y. 688, 25 N. E. 1091; *Kirkwood* v. *Smith* 47 Misc. Rep. 301, 95 N. Y. Supp. 926; *Stone* v. *Wright Wire Co.*, 199 Mass. 306, 85 N. E. 471; *Calkins* v. *Worth*, 215 Ill. 78, 74 N. E. 81; *Bradley* v. *Wolff*, 40 Misc. Rep. 592, 83 N. Y. Supp. 13; *Flower* v. *Barnekoff*, 20 Or. 132, 25 Pac. 370, 11 L. R. A. 149; *Scudder* v. *Budd*, 52 N. J. Eq. 320, 26 Atl. 904; *Humburg* v. *Lotz*, 4 Cal. App. 438, 88 Pac. 510; *McMullen* v. *Hoffman*, 75 Fed. 547; *Van Tine* v. *Hilands*, 131 Fed. 124; *McElroy* v. *Swope*, 47 Fed. 380; *Boqua* v. *Marshall*, 88 Ark. 373, 114 S. W. 714; *Delmonico* v. *Roudebush*, 5 Fed. 165; *Spier* v. *Hyde*, 92 App. Div. 467, 87 N. Y. Supp. 285; *Reilly* v. *Freeman*, 1 App. 560, 37 N. Y. Supp. 570.)"

In *Clark* v. *Mitchell*, 35 Nev. 459, we quoted with approval a part of the following language from the opinion of the

Circuit Court of Appeals, in *Trice* v. *Comstock,* 121 Fed. 622, 57 C. C. A. 648, 61 L. R. A. 176: "For reasons of public policy, founded in a profound knowledge of human intellect and of the motives that inspire the actions of men, the law peremptorily forbids every one who, in a fiduciary relation, has acquired information concerning or interest in the business or property of his correlate from using that knowledge or interest to prevent the latter from accomplishing the purpose of the relation. If one ignores or violates this prohibition, the law charges the interest or the property which he acquires in this way with a trust for the benefit of the other party to the relation, at the option of the latter, while it denies to the former all commission or compensation for his services. * * * And, within the prohibition of this rule of law, every relation in which the duty or fidelity to each other is imposed upon the parties by the established rules of law is a relation of trust and confidence. The relation of trustee and *cestui que trust,* principal and agent, client and attorney, employer and employee, who through the employment gains either an interest in or a knowledge of the property or business of his master, are striking and familiar illustrations of the relation. From the agreement which underlies and conditions these fiduciary relations, the law both implies a contract and imposes a duty that the servant shall be faithful to his master, the attorney to his client, the agent to his principal, the trustee to his *cestui que trust,* that each shall work and act with an eye single to the interest of his correlate, and that no one of them shall use the interest or knowledge which he acquires through the relation so as to defeat or hinder the other party to it in accomplishing any of the purposes for which it was created. (2 Sugden on Vendors, 8th Am. ed. 406–409; Mechem on Agency, pp. 455, 456; *Tisdale* v. *Tisdale,* 2 Sneed, Tenn. 596, 608, 64 Am. Dec. 775; *Ringo* v. *Binns,* 10 Pet. 269, 280, 9 L. Ed. 420; *McKinley* v. *Williams,* 74 Fed. 94, 95, 20 C. C. A. 312, 313; *Lamb* v. *Evans,* 1 Chan. Div. 218, 226, 236; *Connecticut Mutual Life Insurance Co.* v. *Smith,* 117 Mo. 261, 295, 22 S. W.

623, 38 Am. St. Rep. 656; *Van Epps* v. *Van Epps*, 9 Paige, N. Y. 237, 241; 1 Lewis on Trusts, 246, 180; *Davis* v. *Hamlin*, 108 Ill. 39, 49, 48 Am. Rep. 541; *Winn* v. *Dillon*, 27 Miss. 494, 497; *People* v. *Township Board*, 11 Mich. 222, 225; *Grumley* v. *Webb*, 44 Mo. 444, 454, 100 Am. Dec. 304; *Lockhart* v. *Rollins*, 2 Idaho, Hasb. 540, 21 Pac. 413; *Eoff* v. *Irvine*, 108 Mo. 378, 383, 18 S. W. 907, 32 Am. St. Rep. 609; *Robb* v. *Green*, 2 Q. B. 315, 317, 318, 319, 320; *Louis* v. *Smellie*, 73 Law Times, 226, 228; *Gardner* v. *Odgen*, 22 N. Y. 327, 343, 350, 78 Am. Dec. 192.) * * * It is contended that no trust arose because Trice and Beamer had no interest in or control over the lands. But no interest or control of the property to which the agency relates is essential to the raising of the trust. The fiduciary relation and a breach of the duty it imposes are sufficient in themselves. (*Winn* v. *Dillon*, 27 Miss. 494, 497; *People* v. *Township Board*, 11 Mich. 222, 225; *Grumley* v. *Webb*, 44 Mo. 444, 454, 100 Am. Dec. 304; *Lockhart* v. *Rollins*, 2 Idaho, Hasb. 540, 21 Pac. 413.) If one employs and pays an agent to investigate the title or the character of land for the purpose of purchasing it, and the agent uses the knowledge he acquires in this way to forestall his principal and obtain a title to the property for himself, it is no answer to the suit of the former to recover the land from his agent that the employer never had any title or interest in it, or that he was not injured by the action of the agent. In *Winn* v. *Dillon*, 27 Miss. 494, 495, the complainant, Winn, employed Dillon for the agreed compensation of $200 to search out and furnish to him the numbers or descriptions of state lands which he might enter under an act of the legislature of the State of Mississippi. Dillon furnished the descriptions pursuant to contract. But before Winn had completed his entry of the lands Dillon entered them in his own name and for himself. Neither of these parties had any interest in, or control over, this property at the time that the contract of employment or agency was in force; but the court said: 'Winn's object was to enter the lands; he had engaged the services

of Dillon to that end, and this created the relation of private trust and confidence which disabled Dillon from doing any act or acquiring any interest in the property adverse to the. interest of Winn'; and it declared that the title in the hands of Dillon was charged with a trust for the use and benefit of his employer, Winn. Concede that the complainants had no contract for the purchase of this land from its owners, Reid and Green, yet they knew that it could at any time be purchased for the price of $20 per acre. Their scheme was to buy it at that price and sell it at a higher one. This was a legitimate business enterprise. The object of the agency of Comstock was to carry out this plan. His use of the knowledge he acquired through his agency to prevent his principals from accomplishing this purpose and to appropriate the benefits of the scheme to himself alone was as flagrant a breach of confidence and as fatal to his title to this property as it would have been if Trice and Beamer had held an unassailable agreement for the purchase of the land. * * * Every agency creates a fiduciary relation, and every agent, however limited his authority, is disabled from using any information or advantage he acquires through his agency, either to acquire the property or to do any other act which defeats or hinders the efforts of his principals to accomplish the purpose for which the agency was established. * * * The truth is that the principle of law which controls the determination of this case is not limited or conditioned by the interests, powers, or injuries of the parties to the fiduciary relations. It is as broad, general, and universal as the relations themselves, and it charges everything acquired by the use of the knowledge secured by virtue of these trust relations and in violation of the duty and fidelity imposed thereby with a constructive trust for the benefit of the party whose confidence is betrayed. It dominates and controls the relation of attorney and client, principal and agent, employer and trusted employee, as completely as the relation of trustee and *cestui que trust*. In *Greenlaw* v. *King*, 5 Jur. 19, Lord Chancellor Cottenham, speaking

of this doctrine, says: 'The rule was one of universal application, affecting all persons who came within its principle, which was that no party could be permitted to purchase an interest when he had a duty to perform which was inconsistent with the character of a purchaser.' In *Hamilton* v. *Wright*, 9 Cl. & Fi. 111–122, Lord Brougham declared that it is the duty of a trustee 'to do nothing for the impairing or destruction of the trust, nor to place himself in a position inconsistent with the interests of the trust.' And on page 124 he said: 'Nor is it only on account of the conflict between his interest and his duty to the trust that such transactions are forbidden. The knowledge which he acquires as trustee is of itself sufficient ground for disqualification, and of requiring that such knowledge shall not be capable of being used for his own benefit to injure the trust.' The rule upon this subject was clearly and not too broadly stated in the American note to *Keech* v. *Sandford*, 1 White & T. Lead. Cases in Eq. (4th Am. ed.) p. 62 (*page 58), in these words: 'Whenever one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the persons with whose interests he has become associated.' "

Regarding joint adventures it is said, in 23 Cyc. 454: "If no date is fixed by the contract for the termination of the adventure, or its termination is dependent upon the happening of a contingency, the agreement remains in force until the purpose is accomplished, or the happening of the contingency, and neither party can end it at will by notice or otherwise. * * * Where property is purchased as a joint venture, it is not material in whose name the title is taken, as any one holding the title will be regarded as trustee for his associates. * * * Persons united for a common purpose must be loyal to that purpose and each other. None may, without the

consent of all the associates, appropriate to his own use the common property, or by his dealing therewith secure an unfair advantage over those interested with him. An advantage or profit secured by one inures to the benefit of all. * * * Those aiding him in procuring an advantage may, in equity, be held equally liable with him for the fraud."

Over the citation of many authorities, these principles are stated by Mr. Pomeroy at sections 918, 959, 1044, and 1050 of the third edition of his work on Equity Jurisprudence. He says: "A trustee or person clothed with a fiduciary character shall not be permitted to use his position or function so as to obtain for himself any advantage or profit inconsistent with his supreme duty to his beneficiary. * * * As between the *cestui que trust* and trustee and all the parties claiming under the trustee, otherwise than by purchase, for valuable consideration without notice, all property belonging to the trust, however much it may be changed or altered in its nature or character, and all the fruit of such property, whether in its original or its altered state, continues to be subject to or affected by the trust." Other cases in point are cited in the note in 17 Ann. Cas. at page 1022. In *Root* v. *Railway Co.*, 105 U. S. 215, 26 L. Ed. 975, it was held that trust property may be followed wherever it can be traced and into whosesoever possession it comes, except that of a *bona fide* purchaser without notice.

**6.** Two days after the entry of judgment the plaintiffs filed and served a notice of motion to retax costs. Later the defendants objected to the hearing of motion to retax costs because no "motion" to retax had been filed within two days after the entry of judgment. We think the court erred in making the order that defendants' objections to the hearing of the motion to retax costs be sustained, and that the proceeding be dismissed. An opinion in regard to this order may be filed later.

The judgment of the district court in favor of the defendants and the order refusing to grant a new trial

are reversed, and the case is remanded for a new trial. The order sustaining the objections to the hearing of the motion to retax costs and dismissing the proceeding to retax costs is also reversed.

NORCROSS, J.: I concur.

McCARRAN, J., having become a member of the court after the argument and submission of the case, did not participate in the opinion.

[Petition for a rehearing pending.]

SUPPLEMENTAL OPINION ON COSTS

By the Court, TALBOT, C. J.:

The plaintiffs took a separate appeal from an order sustaining objections to and dismissing their motion to retax costs. This appeal was presented, briefed, and argued at the same time as the one upon the merits. In the decision upon the merits, recently rendered, we included an order reversing the order of the district court sustaining the objections to the motion to retax costs, and intimated that an opinion in regard thereto might be filed later.

1. The question presented is whether, under rule 34, which provided that "the party against whom judgment is entered shall have two days after service of a copy of the cost bill in which to move to retax costs," which rule was in force at the time the order was made by the district court, and has since been superseded by section 445 of the new practice act (Rev. Laws, 5387), "a notice of motion" to retax costs, filed and served within two days after service of the cost bill, was sufficient, without actually filing and making in court within that time a motion to retax.

The cost bill was filed and served on Saturday, June 26. On Monday, June 28, respondents filed and served a notice stating that on Saturday, July 10, the "plaintiffs will move the above-entitled court for an order to retax

defendants' costs and disbursements herein and to strike out the defendants' memorandum of costs and disbursements," specifying certain items aggregating $1,888.45. The court was not in session on July 10, and the matter eventually came on for hearing on August 21, when the plaintiffs moved the court orally for an order to retax costs. The defendants objected to the consideration by the court of any motion to retax, upon the grounds: "That plaintiffs did not move to retax costs within two days after the service on them of defendants' cost bill; that no motion to retax costs has ever been filed or recorded; that there was no motion pending before the court, and the defendants moved the court to dismiss this hearing and proceeding."

In its order the court said: "That no motion or other paper relative to the retaxing of costs, other than the said notice, was served, filed or recorded in this court, and there is no motion before the court at this time for its consideration. That the plaintiffs did not move to retax costs within two days after service upon them of a copy of defendants' cost bill, or as provided by rule 34 of this court. It is therefore ordered that defendants' objections to the hearing by the court of a motion to retax the costs herein be sustained, and that this proceeding be dismissed."

It is claimed that the trial court was not authorized to retax costs, first, because plaintiffs did not move within two days; and, secondly, because the notice given was opposed to the spirit of rule 34. It is said that, as defined by statute, "an application for an order is a motion," that notice to opposing counsel is not an application to the court, and that the word "move" expresses action and not intention. It will be observed that the court rule does not use the word "motion," but states that the party shall have the two days "in which to move to retax costs."

If for the argument it be conceded that an application for an order is a "motion," it does not necessarily follow that every "move" made by a party in legal proceedings

must be by "motion." If the court were inclined to enforce the literal language of the rule, instead of giving it a liberal interpretation, it might still be said that by first filing and serving a notice that on a certain day he will apply to the court for an order a litigant makes a move to retax costs.

Careful lawyers usually follow the better practice, which recognizes the well-known distinction between a "motion" and a "notice of motion"; but we conclude that justice will be better served by holding that notice of the motion was sufficient until the motion was made before the court at the time of the hearing. We have often held that an oversight or technicality which did not affect the substantial rights of the parties should be disregarded. (*State* v. *Mircovich*, 35 Nev. 485.)

Under the decisions of the Supreme Court of California such practice would be allowable, if the court rule had directly provided that a "motion to retax the costs" should be made within two days after service of cost bill. At the time this court rule was adopted there were only three district judges in the state, and in most of the counties, as in several of them now, a district judge was seldom present, and usually a motion to retax costs could be heard or made in open court for a much longer period than two days. The statute has long provided that at least two sessions of court annually must be held in the county. The filing and service of notice of motion to retax costs within two days after the service of the cost bill was sufficient, until such time as a session was held and a motion could be presented to the court.

Section 1033 of the California code of civil procedure provides that a "party dissatisfied with the costs claimed may, within five days after notice of the filing of the bill of costs, file a motion to have the same taxed." In *Carpy* v. *Dowdell*, 129 Cal. 244, 61 Pac. 1126, the supreme court held that it was error for the trial court to refuse to hear the motion to retax costs on the ground that it was not in writing, and in the opinion said: "The reason and

intention of the lawgiver will control the strict letter of the law in interpreting the same, when to adhere to the strict letter would lead to injustice or absurdity. The substance of the law as it stands is that the party who is dissatisfied with the bill of costs as filed must within a certain time make his objection known and the grounds on which he will move the court to correct or strike out the cost bill. When this is done by the proper notice in writing, served and filed, specifying the time when the application to the court or judge will be made, the object of the law would seem to have been complied with, and no useful purpose would be subserved by requiring the motion to be committed to writing, instead of being made orally to the court or judge in the usual manner. It is one of the maxims of the law that it respects form less than substance."

In *Kishler* v. *Southern Pacific R. Co.*, 134 Cal. 636, 66 Pac. 848, the court said: "It is claimed that defendant's motion came too late, and that serving the written notice of the motion was not sufficient, but that the motion itself should have been filed within five days after the notice of the bill of costs. (Code Civ. Proc. 1033.) The universal practice in this state has been to serve and file written notice of the motion to tax the cost bill as the equivalent of filing a motion, within five days, and on the day designated in the notice, or the day to which the hearing shall have been postponed, to call up the notice and make the motion *viva voce;* a note of the motion being made by the clerk on his minutes. We think this practice is sufficient compliance with the statute."

In addition to the general rules, the district court of Esmeralda County has in force one known as rule 46, which provides: "Each Saturday, unless the court be not sitting, shall be known as 'Calendar Day,' and the order of business on such day shall be as follows: 5. Hearing questions of law previously noticed for hearing as hereinafter provided. On 'Calendar Day' no motions or demurrers will be heard, unless written notice, properly

entitled in the cause, shall have been properly served on opposite counsel not later than Monday of the same week, and filed not later than Thursday of each week."

2. It is contended that under rule 34 the party must act promptly, and that appellants should have noticed the hearing of the motion for July 3 instead of July 10. Although the amount of costs to be allowed after judgment should be speedily determined in case of dispute, we do not regard the notice of the hearing for the second Saturday, instead of for the first Saturday, or calendar day, after service and filing of the notice as prejudicial. If respondents were likely to be damaged, or felt aggrieved by reason of the hearing being noticed for a date later than necessary, they could have asked the court to shorten the time for notice, and to require appellants to appear and have the hearing on the first calendar day.

## ON PETITION FOR A REHEARING
### ORDER OF DISMISSAL
*Per Curiam:*

The appellants in the above-entitled action, having on the 10th day of February, 1914, and while the cause was pending on a petition for rehearing, filed in this court a statement to the effect that the claim upon which the suit was brought has been fully paid, satisfied, and discharged, and consenting and requesting that a judgment of dismissal be entered herein, and that such dismissal operate as a *retraxit*, each party paying his own costs, and the respondents appearing and consenting thereto, therefore

*It is ordered,* That the above-entitled action be, and the same hereby is, dismissed, each party to pay his own costs.