VAN TINE v. HILANDS.

(Circuit Court, S. D. New York. July 26, 1904.)

1. JOINT ADVENTURE—PARTNERSHIP—EVIDENCE.

In a suit for an accounting of the profits of a joint adventure, evidence reviewed, and *held* to justify a finding that the parties had agreed to prosecute the same in partnership, and share equally the profits and losses.

2. SAME—ACCOUNTING—DEFENSES—FRAUD.

Where plaintiff and defendant entered into a partnership to share the profits and losses in the purchase and sale of certain stock, it was no defense to defendant's liability to account for all of the profits received that

certain of them had been illegally received by accepting commissions from both the purchaser and the seller of the stock, in which improper conduct plaintiff did not participate.

In Equity for Partnership Accounting.

Abram I. Elkus, for complainant.
Gilbert E. Roe, for defendant.

COXE, Circuit Judge. This is an equity action for an accounting. The bill alleges that, in February, 1901, the parties entered into an agreement by which they were to procure options on large blocks of stock of the Carnegie Company, held by parties residing at Pittsburg, Pa., and sell the same, dividing the profits and losses equally between them. Pursuant to such agreement the complainant was to contribute his services in securing the stock and the defendant was to procure purchasers therefor. Between February 12 and March 1, 1901, the complainant procured 4,475 shares of said stock, which was sold by the defendant, who received for his services from the vendors and vendees the sum of $460,189 and other large sums to the complainant unknown. That the defendant has paid the complainant the sum of $2,600, but with this exception he retains the profits received by him and refuses to account for the same. The judgment demanded is that an accounting be had and the defendant decreed to pay over to the complainant his share of the partnership profits.

The answer is a denial of the principal allegations of the bill, the defendant alleging that there was never a partnership agreement between the parties as stated in the bill, and that the co-operation of the complainant in the sale of said stock was confined to one small transaction which was expressed in writing, pursuant to the terms of which the complainant was paid in full settlement of his claims the sum of $1,600.

The main issue between the parties is one of fact, namely, was there a partnership agreement between them to share the profits jointly on the sale of stock of the Carnegie Company? This question is pre-eminently one for a jury and at the argument it was suggested that issues be framed and sent to a jury for answer, but neither counsel was ready to assent to the proposition. There is, therefore, no alternative but to dispose of the controversy upon the present record. The court, however, feels constrained to say that the impropriety of requiring such a question, which depends so largely upon the appearance and conduct of the witnesses, to be determined without the advantage of seeing and hearing them must be apparent to all. There is an irreconcilable contradiction between the parties and yet the court is compelled to decide the controversy without the aid of many of the almost infallible guides which make it well-nigh impossible to obscure the pathway of truth.

It is wise to start the inquiry with a consideration of conceded facts and those regarding which there is no serious dispute. The circumstances out of which the controversy arose took place in the winter of 1901 when the United States Steel Corporation was being formed, when transactions of great magnitude were being negotiated and fortunes were made daily by those who possessed the ability or audacity to seize the opportunity of the hour. The defendant was in New York for the

purpose of purchasing Carnegie stock of parties residing at Pittsburg. By the aid of the complainant he succeeded in securing at least 1,543 shares of this stock, making a profit thereon of not less than $175,000. Both parties knew that it was a time of almost unprecedented speculative activity, when immense sums were being paid, out of all proportion, apparently, to the services rendered, and when millions were made by men who were not conspicuous for either industry or ability. It is not probable that at such a time any one with the slightest business sagacity was giving away opportunities of unquestioned value. The complainant controlled an opportunity which the defendant wanted. Both knew this. The delay of a week might be fatal to both. Some one else might get the Moreland stock or the demand for it might no longer be urgent. Whoever succeeded in disposing of this stock would probably secure other stock held in Pittsburg. That the complainant rendered valuable services is not denied; that the defendant felt himself under obligation to remunerate the complainant in some form is admitted. In such circumstances it seems probable that the parties would enter into an agreement of some kind and the most natural agreement to make would be to divide the profits. If the complainant were uncorroborated it would be an exceedingly difficult task to determine where the truth lies. Six witnesses have testified to the bad character of the complainant and two to the bad character of the defendant. True, sustaining witnesses have also been called, but the fact remains that, even when one citizen of good repute is compelled to say of his neighbor that his oath is valueless, it is safe to assume that there is something in the latter's career to justify the opinion. Men of high honor are never subjected to such attacks. Suffice it to say that the narrative of neither party, standing alone, commends itself to the court; the conviction is forced on the mind that both are disingenuous and are seeking to withhold important facts; neither is telling the exact truth.

But the complainant is corroborated first by the testimony of Moreland and Walker, witnesses whose word there is no just reason to doubt; second, by the documentary evidence; and, third, by the probabilities. Mr. Moreland testifies that both Hilands and Van Tine told him, when all three were together, that they were going into partnership to handle the Carnegie stock and that the profits were to be divided equally between them. This is precisely complainant's version of the transaction. Indeed, it is unnecessary to discuss this branch of the subject at length, for the reason that the defendant's brief admits, what is unquestionably the fact, that "the complainant is corroborated in his testimony by his witness, Andrew M. Moreland." Mr. Walker's testimony is to the same effect. The defendant's brief contains this statement:

"There is nowhere, in all Mr. Walker's testimony a suggestion that it was ever stated to him by either complainant or defendant that profits were to be divided equally between them."

It is thought that counsel has inadvertently overlooked that portion of Mr. Walker's testimony where he says (page 218):

"Mr. Hilands sent for pen, paper and ink and wrote out what I would call a provisional bill of sale of the stock. He stated * * * that he would sell it for the best he could get, but all that would be in it to him was the one

per cent. named in the bill of sale, and that I knew was to be divided between him and Mr. Van Tine, as they were working as partners in the transaction."

And, again (page 227):

"I knew that Mr. Van Tine had told me that he and Hilands were partners; and Mr. Hilands confirmed that in my room in the Manhattan Hotel, that they were partners working this thing together."

Pursuant to the agreement with the defendant the complainant went to Pittsburg to secure other stock and while there several telegrams and letters passed between them confirmatory of complainant's version of the transaction. The defendant's attempts to deny the responsibility for the letter sent by him and the telegrams and letter received from the complainant do credit neither to his intelligence nor his veracity. On February 25th, there having been dispute as to the expenses to be deducted prior to the division of profits, the complainant wrote out a paper which the defendant signed as follows:

"New York, Feb. 25, 1901.

"It is agreed that W. H. Van Tine is to share equally with me in commissions on the sale of Curry estate Carnegie stock (represented by Thomas D. Chantler).

"W. J. Hilands."

The defendant admits that this writing was made at his suggestion and that he signed it. He says, however, that the words in parenthesis were not there when he signed it. Whether they were there or not is immaterial, in either case the legal effect of the paper is the same. It is contended that it is quite improbable that a man of Hilands' experience in the sale of stocks and bonds would make the contract which is the basis of the action. But of what avail are such arguments in the face of the unquestioned fact that the defendant did make precisely that contract when about to negotiate for the sale of 3,000 shares of stock?

It is urged that this is not the contract sworn to by Moreland, for the reason that it uses the word "commissions" and not "profits." The point is not persuasive. In the business in which they were engaged the two words are substantially synonymous. When a broker buys or sells stock for a customer his commissions are profits and his profits are commissions. But even were this otherwise, the distinction is too attenuated to base thereon a theory that the man who signed the Curry agreement without demur would balk at the Moreland agreement.

Again, the agreement is criticised because there was no provision for the sharing of losses. The answer is that in such a contract the agreement would be implied if there were any losses; but it will be observed that the business was of such a character that loss could not occur. They neither purchased nor sold stock. They incurred no expense. They acted simply as brokers, finding vendor and purchaser and bringing the two together.

It is said, further, that the agreement is too indefinite, no time being mentioned for its continuance. This objection, also, is hypercritical. The contract was made between friends meeting casually in New York to dispose of certain designated stock, owned by a small number of shareholders, for a particular purpose and for a necessarily limited

period. It may be said, generally, of all this class of objections that, in such circumstances, it is hardly to be supposed that the parties would deem it necessary to have a formal contract drawn up by a lawyer. If their intention can be ascertained from the testimony it is the duty of a court of equity to vitalize such intention and enforce it.

Regarding the Moreland sale the point is made that the entire transaction was fraudulent because the parties were acting for both Moreland and Morgan & Co., taking compensation from both. The defendant testifies that he told Moreland that he was being taken care of by the purchaser and that there were no commissions for him (Moreland) to pay. The complainant did not know of the payment of the $88,400 by Morgan & Co., or the agreement by them to compensate Hilands until long afterwards. Assuming, however, the existence of the double agency the answer to the defendant's proposition is found in the language of the court in Pennington v. Todd, 47 N. J. Eq. 569, 21 Atl. 297, 11 L. R. A. 589, 24 Am. St. Rep. 419.

"When an innocent member of a firm, established for the conduct of a lawful and moral business, calls upon his partner for a share of profits made in partnership transactions, is the partner absolved from the duty of dividing, if he shows that he realized the profits by cheating the customers of the firm? * * * When the plaintiff is blameless, and the contract on which he stands is legal and moral, no court has ever permitted a defendant to escape responsibility because of his own misconduct."

Numerous criticisms are made of complainant's testimony and many mistakes of time and place are pointed out. For instance, the complainant testified that he met and talked with the defendant on the veranda of the Manhattan Hotel. The hotel has no veranda. Complainant testified that he first saw Hilands on Saturday morning, February 9th. It is now quite clearly established that the defendant did not reach the hotel, from Montreal, until Sunday morning, February 10th, and saw the defendant first on that day for a few moments. In view of the undisputed facts that the parties met at the hotel and negotiated there, the foregoing and all similar mistakes are deemed to be immaterial.

Without adverting further to the evidence the court cannot resist the conclusion that an agreement existed between the parties substantially as alleged in the complaint, that the complainant rendered valuable services in the common venture and is entitled to share in the profits.

The facts regarding the sale of the Curry stock are somewhat obscure. The actual transfer seems to have been negotiated through Col. McCook, but the inference is strong that $48,160 placed to the credit of the defendant was on account of services rendered by him and complainant in the Curry transaction. The exact nature of this transfer to Hilands can be shown on the accounting and if the said sum, or any part thereof, is shown to be in the nature of "commissions on the sale of Curry estate stock" the complainant is entitled to half thereof.

It follows that the complainant is entitled to the relief demanded in the bill. Unless the parties can agree upon the amount a reference will be ordered to take and state the account.