[Civ. No. 1560.   Second Appellate District.—July 16, 1914.]

# A. B. SPENCER, Respondent, v. LEGENE S. BARNES, Appellant.

PARTNERSHIP—WHAT CONSTITUTES—CO-OPERATION IN SALE OF MINING PROPERTIES—SINGLE VENTURE.—Where two persons enter into an oral agreement to obtain an option on certain mining properties and sell them at a profit which is to be divided between them, their agreement constitutes a partnership although the object thereof is a single venture only.

ID.—ACTION FOR ACCOUNTING—NECESSITY FOR DECREE DISSOLVING PARTNERSHIP.—In an action between the parties to such an agreement for an accounting of the profits arising from sales, it is not necessary that the complaint should pray for, or that the court should decree a dissolution of the partnership, if it sufficiently appears from the pleadings that the purpose of the partnership has been fully accomplished prior to the suit.

ID.—PROFITS ILLEGALLY MADE—RIGHT OF INNOCENT PARTNER TO ACCOUNTING.—If it appears in such action that the defendant has illegally obtained profits in the prosecution of the venture, the plaintiff may invoke the rule that an innocent member of a partnership, created for conducting a lawful business, is entitled to share in a profit which his partner has realized by misconduct in carrying on the business.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Curtis D. Wilbur, Judge.

The facts are stated in the opinion of the court.

John D. Pope, Oscar Lawler, and James E. Degnan, for Appellant.

Lewis R. Works, Andrew M. Strong, Antonio Orfila, and Francis Marion Etheridge, for Respondent.

SHAW, J.—This action grew out of an alleged agreement between plaintiff and defendant whereby, as copartners, they consummated a sale of certain iron mining properties, defendant receiving and appropriating to his own use the commission or profits derived from the making of such sale. The suit is to recover a specified sum and for an accounting.

Judgment went for plaintiff, from which, and an order denying his motion for a new trial, defendant prosecutes this appeal.

It appears that in June, 1907, plaintiff was a resident of Tucson, Arizona, where he was engaged in some mining venture. Defendant resided in Long Beach, California, where he was engaged in the real estate business. There existed a relationship of some intimacy between their respective wives, between whom there was an interchange of letters in which there were mutual complaints of dull times. The wife of plaintiff wrote the wife of defendant to have her husband come to Tucson, where she felt sure defendant and plaintiff could find some properties to sell and make some money. Following this letter defendant went to Tucson, spending several days with plaintiff in looking over and inspecting certain mining properties (not involved in this action, but referred to in order to obtain a proper understanding of· the situation), known as the Papago, Wilson, and Rumple properties. The prospect of a sale of these mines appears to have been the only subject of mutual interest during· the first days of defendant's visit, neither at that time being cognizant of the iron properties the commissions for the sale of which constitute the subject of this suit. While plaintiff and defendant were inspecting the Papago and other properties the latter took some photographic views thereof, and on their return to Tucson they went to the studio of a photographer, with whom plaintiff was acquainted, to have these views developed. On the occasion of this visit and while discussing these photographic views, the photographer, W. B. Parker, stated that he was interested in some iron properties in Riverside County, California, and exhibited samples. of ore therefrom, together with a blue-print of the properties, comprising some seventy claims, and mentioned the names of the owners thereof, with whom he and Walter W. Brown, who resided in Los Angeles, had been corresponding in an effort to get them together in order to make a sale thereof. Of these claims Parker owned fifteen, Walter W. Brown owned thirty, and The Colorado Fuel & Iron Company and Stevens, Dofflemyer, and McGregor owned twenty-five, which were patented. The profits derived from a sale of the Brown claims is the subject around which the controversy revolves. During the interview Barnes asked Parker if the properties

were for sale, to which the latter replied in the affirmative, but stated they were not yet in shape to present to any one owing to the fact that the parties had not all fixed a price upon their respective holdings, and further that some of the properties were held under an option to purchase which would expire about September first. Defendant then said to Parker: "If anything comes up on this and you get ready to do business on it, just speak to Mr. Spencer and it will be all right. He will let me know." Plaintiff testified that after this interview with Parker, it was agreed that plaintiff was to do all he could in Tucson in getting papers and things ready and send them to defendant, who was, at his own expense, to do the negotiating with prospective buyers, and if a sale was effected the profits should be divided. Mrs. Spencer the wife of plaintiff testified that the evening preceding defendant's departure for Long Beach he, in a conversation with plaintiff, said: "I will leave everything at this end of the line for you to look after and I will bear the expense, and then what is left of the profit we will divide." Defendant left Tucson about July 2d, returning to Long Beach, and plaintiff took up negotiations with Parker, transmitting to defendant by letter such information as he obtained. On August 28th defendant wired plaintiff to "get option and papers on Parker's property to me as soon as possible," which telegram was confirmed by letter of the same date wherein defendant stated: "I believe that is a property that we can handle." On September 9th defendant wrote to plaintiff, saying: "I will take Parker's proposition up this afternoon with that man Brown, of Los Angeles, as you suggest. . . . I have some people who have the money and will do business if we can only get it into shape so we can handle it. I believe I have received all your letters, and I appreciate your work in this. You have made the deal plain to me and I will go and see Brown this afternoon." On October 8th defendant wrote a lengthy letter to plaintiff upon the subject of the proposed deal, saying that he had seen Dofflemyer and stating: "I have his interest tied up, also Brown's, Stevens's, and in fact all of them except Parker and his people. . . . I have had to change the deal in regards to prices and terms, but I feel confident that we can make a sale now. I am selling a three-quarters interest in the twenty-five patented claims for $262,500, on which we

will get a ten per cent commission. . . . I am selling Brown's 30 claims for $100,000 net to him. . . . Brown signed the same kind of a paper as the one which I shall send you to have Mr. Parker and his people sign. . . . Now I am selling Parker's 15 claims for $65,000, but I want you to tell him that is $50,000 net to him; the $15,000 goes to you and I, and I would like you to draw up some kind of an agreement that Mr. Parker can sign, showing that if the sale is made the $15,000 is to be paid to us in the same manner as he gets his payments.'' The letter also refers to the Rumple and Wilson property, defendant suggesting that plaintiff endeavor to get a thirty-day extension of their option on the same, and in reference to the deal generally, states: ''I have already spent over $300 on this deal and expect it will cost me about $500 more before it is closed, but it is worth the money if we get it closed.'' There was an option contract for the purchase of Parker's claims at a price of fifty thousand dollars transmitted to plaintiff with the request that plaintiff obtain Parker's signature thereto. In this he failed for the reason, as stated by Parker, he would not sell for less than sixty-five thousand dollars, which price he eventually received upon the deal being consummated, defendant having procured from him a contract for a sale at said sum. It is unnecessary to quote further from the correspondence.

That the parties entered into a copartnership for the purpose of securing a contract with the owners and effecting a sale of the properties is not only shown by the answer, which admits that defendant and plaintiff entered into a verbal agreement to co-operate in selling the properties in question and agreed in the event of so doing to divide the profits, but is clearly shown by reference to the evidence. The fact that the subject of the agreement was a single venture only, as alleged in the answer, was immaterial; it was none the less a copartnership for such venture.

The court found the allegations of the answer, to the effect that plaintiff abandoned the copartnership enterprise long prior to the consummation of the sale, to be untrue. The claim of appellant that this finding is unsupported by the evidence is chiefly based upon a letter written by plaintiff to defendant on August 19th, wherein he says: ''Please return to me by express all the maps, reports, and etc., which I sent you, and we will go out of the mining business. If

you care to do so, you can tell me what you wrote or wired south, for unless I know I am placed in a bad light with those people." Plaintiff testifies that this letter referred solely and alone to what was known as the Papago property, the owners of which resided in the south; that he was manager of said property and represented the owners thereof; that defendant was to write to the owners of the property giving references as to his standing and aid him in assembling the stock in escrow. The inference to be drawn from the testimony is that defendant in writing to the owners of the property had placed plaintiff in an embarrassing position with his employers. That it was intended to refer to this deal only, is corroborated by the fact that at the date of the letter, August 19th, nothing whatsoever, other than what occurred in the first interview with Parker, as heretofore stated, had been done by the parties toward securing a sale of the iron properties. Not only this, but the correspondence hereinbefore referred to and the conduct of the parties after August 19th clearly tend to show that plaintiff and defendant were jointly engaged in an effort to secure contracts, options or escrows which would enable them to negotiate a sale of the iron properties, either for a commission or at a price in excess of that fixed by the owners thereof, which, in case of the consummation of a sale, would afford them a profit, and that defendant understood the letter had reference solely and alone to the Papago property, of which plaintiff was manager, and the maps, reports, etc., of which, mentioned therein, had been placed in possession of defendant.

The answer alleged that the sole consideration for the contract of copartnership made with plaintiff was an agreement on the part of the latter to secure from the owners of the properties options thereon which defendant could use in negotiating sales of the property, and further alleged a failure on the part of plaintiff to secure such or any options for the sale of the properties. The record discloses a conflict of evidence touching this issue. Hence, the finding of the court that it was not agreed that plaintiff was to secure the options, as alleged, is conclusive upon this appeal. (*Anglo-California Bank* v. *Cerf*, 147 Cal. 384, [81 Pac. 1077].)

The court found that it was agreed between the parties that all expense incurred by defendant in the consummation of a sale of the property should be paid by defendant, and

further found that all moneys expended by him in negotiating said sale were provided and advanced by R. H. Sayers and S. H. Roberts, who were reimbursed for such advances by the vendors of the property out of the proceeds of the sale thereof. These findings are attacked for want of evidence to support them. The contention is without merit. The finding to the effect that defendant was to advance all expenses is clearly supported by the testimony given by plaintiff. While there is some evidence tending to show that defendant incurred expense in negotiating the sale, the record is silent as to what sum or sums he paid out, other than the three hundred dollars. Moreover, it appears, with little if any conflict of evidence, that Sayers and Roberts advanced the money to finance the making of the sale, each receiving from the proceeds of the sale of the Black Diamond group of mines, owned by Walter W. Brown, the sum of fifty thousand dollars as compensation for such advances.

Appellant insists the judgment must be reversed for the reason that there was no prayer in the complaint for a dissolution of the copartnership and no decree rendered dissolving the same. The general rule is, as contended by appellant, that where one partner as against another seeks an accounting of profits against his copartner, a court of equity will not decree an accounting without also adjudging a dissolution of the copartnership. (*Clark* v. *Hewitt,* 136 Cal. 77, [68 Pac. 303].) In our opinion, the case at bar presents an exception to this general rule. By the terms of the agreement, as alleged in the complaint and admitted by the answer, the parties entered into a partnership having for its sole purpose the sale of certain property described in the complaint. It appears from the pleadings that the sale was fully consummated prior to the institution of this action. Upon the making of the sale the purpose contemplated by the agreement was fully accomplished, save and except the payment to plaintiff of his share of the profits. The finding of the court to the effect that the partnership had never been abandoned was in response to an allegation of the answer which alleged an abandonment prior to the consummation of the sale. In our opinion, the pleadings must be construed as showing the copartnership had terminated, and hence there was no occasion for a decree of dissolution. No objection was made by defendant to the complaint upon the ground that it did not

ask for a dissolution, nor was any exception taken to the judgment as rendered upon such ground. The complaint did pray "for such other relief as to this court may seem just and proper." Under the facts presented, we think the court was justified in assuming that the copartnership was terminated, and therefore it was unnecessary to decree a dissolution. (See *Pettingill* v. *Jones*, 28 Kan. 535; *Meason* v. *Kaine*, 63 Pa. St. 335; *Myers* v. *Winn*, 16 Ill. 135.)

The court further found that in pursuance of the agreement of copartnership defendant, with the assistance of plaintiff, secured options on the properties in his own name for the joint benefit of plaintiff and himself, and on August 10, 1909, consummated a sale thereof to a corporation known as the Iron Chief Mining Company; that included in the properties sold to said Iron Chief Mining Company were thirty claims, known as the Black Diamond group, a five-sixths interest in which was owned by Walter W. Brown, whose interest was sold by defendant to said Iron Chief Mining Company for the sum of three hundred and thirty-seven thousand five hundred dollars; that the other sixth interest in said Black Diamond group was owned by defendant, he having acquired it from Brown as a commission for promoting the sale of Brown's interest in said property, and that the value of defendant's one-sixth interest so acquired from Brown in the Black Diamond group as a commission was the sum of seventeen thousand five hundred dollars. The court further found that, in addition to this sum of seventeen thousand five hundred dollars so received by defendant for the one-sixth interest in the Black Diamond group, he received from Walter W. Brown out of the three hundred and thirty-seven thousand five hundred dollars, proceeds so received by Brown from the sale of his interest in the Black Diamond group of mines, a secret commission and profit in the sum of one hundred and twenty-one thousand two hundred and fifty dollars.

As to this secret profit of one hundred and twenty-one thousand two hundred and fifty dollars, appellant pleads his own fraud and iniquity as a defense to the participation therein by plaintiff. A statement of the manner in which it was obtained is, briefly, as follows: Defendant had been for some time negotiating a sale of the properties to Edward

H. Harriman. On May 17, 1909, these negotiations culminated in a contract made with Harriman which, after reciting that defendant and his assigns were the owners of certain interests in iron properties which Harriman was desirous of buying, provided that defendant was to make conveyances and assignments of options covering such interest held by him personally, which should be placed in escrow, and enter the employ of Harriman or his assigns, and as such employee make every reasonable effort to purchase for his employer the remaining properties and interest therein at the lowest possible figure and co-operate in every way with Harriman to attain the end designated, the intention of the agreement, as stated, being "that the party of the first part (Barnes) shall proceed to acquire for the party of the second part (Harriman), or his assigns, at the lowest possible cost, the properties and rights hereinbefore mentioned and described," for which interest and service Barnes was to receive the sum of one hundred thousand dollars and a salary of one thousand dollars per month, the employment to be terminated at any time at the option of Harriman. Thereafter a corporation, designated the Iron Chief Mining Company, was created and defendant became a director and manager thereof, which position he held during the period covered by the purchase of the properties, and particularly that known as the Black Diamond property owned by Brown. Under the contract made with Harriman, and as a director and manager of Harriman's assignee, the Iron Chief Mining Company, defendant had charge of the negotiations for the purchase of the properties, and particularly the Brown property which, for and on behalf of the Iron Chief Mining Company, he purchased from Brown, agreeing to pay him therefor the sum of three hundred and thirty-seven thousand five hundred dollars. This sum was paid to Brown by draft issued by the Iron Chief Mining Company, and in accordance with an agreement made between Brown and Barnes, was distributed as follows, to wit: To R. H. Sayers, fifty thousand dollars; to S. Horace Roberts, fifty thousand dollars; to W. L. Holland, one hundred and twenty-one thousand two hundred and fifty dollars; Brown retaining the sum of one hundred and sixteen thousand two hundred and fifty dollars for his interest in the Black Diamond property. Holland testified that he was an employee of defendant; that he had no interest in

the properties, and that whatever he did in the matter was as an employee of Mr. Barnes, as well as the other parties, by mutual agreement. The entire sum of one hundred and twenty-one thousand two hundred and fifty dollars was by Holland transferred to defendant. The contention of appellant is that this large sum of money was obtained by means of his unconscionable act in violating the trust imposed in him by Harriman and the Iron Chief Mining Company, of which he was a director and manager, and that hence, owing to it having been obtained illegally, plaintiff is not entitled to share therein.

Appellant cites a number of cases to the effect that by virtue of his relation to the Iron Chief Mining Company he occupied a fiduciary position and as such trustee he could not lawfully make any profit for himself out of the transaction between Brown and the Iron Chief Mining Company, unless such fact was known and approved by the latter. This proposition is too well recognized to require citation of authorities. The principle, however, is not applicable to the facts in the case at bar. The Iron Chief Mining Company is not, so far as shown, suing Barnes to recover the money which he received from Brown; indeed, so far as disclosed by the record, it may have approved his act. There was nothing illegal or immoral in the business for the conduct of which the partnership was established. No taint attaches to the contract made by plaintiff and no act of his can be the subject of condemnation. He is innocent of participation in the design by means of the consummation of which the profits were gained. Hence, the proposition presented is whether or not an innocent member of a copartnership created for conducting a lawful business is entitled to share in a profit which his copartner has realized by misconduct in carrying on the business. While courts will not lend their aid to one who founds his cause upon a contract having for its purpose the doing of an illegal act, nevertheless, "when the plaintiff is blameless, and the contract on which he stands is legal and moral, no court has ever permitted a defendant to escape responsibility because of his own misconduct." (*Pennington* v. *Todd,* 47 N. J. Eq. 569, [24 Am. St. Rep. 419, 11 L. R. A. 589, 21 Atl. 297].) In the case of *Jones* v. *Davidson,* 2 Sneed (Tenn.), 448, the partnership contemplated the business of collecting claims against the federal government. The

defendant in the action in the collection of one of the claims procured the making of a false affidavit, by reason of which fact the transaction was held to be illegal. ·It appeared, however, that the plaintiff who brought the suit for a share of the profits of the transaction in no wise participated in the illegal manner whereby the claim was collected. The court in holding that he was entitled to participation in the profits arising from this illegal transaction, said: "But the plaintiff was no party to this illegal contract, so far as anything appears, and therefore could not be affected by it. In this view, we cannot permit the defendant to allege his own iniquity, to the prejudice of an innocent person." As stated in the Pennington case, the refusal of the court to aid plaintiff in compelling defendant to disgorge the ill-gotten gains would furnish an incentive to such frauds as he had perpetrated, "for if a partner, by showing that he has cheated the customers of the partnership in all his dealings with them, can retain all the profits instead of only half, his temptations to iniquity are doubled." The authorities cited, together with *Van Tine* v. *Hilands*, 131 Fed. 124, and *Thwaites* v. *Coulthwaite*, L. R. (1896), 1 Ch. Div. 496, leave no question in our minds as to the right of plaintiff to participate in the ill-gotten profits of the transaction to the same extent that defendant is benefited thereby.

The judgment and order denying defendant's motion for a new trial are affirmed.

Conrey, P. J., and James, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 11, 1914.