## Grant, Hutcheson Co. v. Pennsylvania Securities Commission.

*Douglas D. Storey* and *Hause, Evans & Baker*, for plaintiff.
*Michael E. Stroup*, for defendant.

WICKERSHAM, J., September 15, 1930.—This is an appeal from the decision of the Pennsylvania Securities Commission, defendant, refusing to register the petitioner as a dealer in securities.

It appears from the record that the petitioner is engaged in the sale and distribution of securities. Its principal office is in the City of New York; it also maintains a branch office in Columbus, Ohio, and now desires to be registered or licensed to deal in securities in the State of Pennsylvania.

The commission filed two opinions in this case, in the first of which it declined to register the petitioner as a dealer in securities for the reason that the commission held the petitioner was an agent or salesman of Clarence H. Hodson, Inc., and not a dealer. The petitioner then requested to be heard under the provisions of section eight of the Securities Act of 1927, which hearing was held January 6, 1930, after which the commission again filed its opinion declining to register the petitioner for the reasons contained in its first opinion.

The question involved in this appeal is whether a dealer in securities who buys securities from one particular broker and sells said securities to his clients is a dealer in securities as contemplated by the Securities Act of 1927 or is only an agent for the broker from whom the securities are purchased.

In answer to the question in the application, "State briefly the general plan and character of the business of the applicant, specifying the nature of the securities in which it is proposed to deal, and the plan of marketing, whether

by personal solicitation, advertisement, correspondence, or otherwise, whether as principal or broker," the petitioner's answer was: "Issues of the house of Clarence Hodson & Co., Inc., 165 Broadway, New York; personal solicitation and *correspondence.*"

From this statement and from a letter of petitioner, the commission concluded that the petitioner's plan of business was to be confined solely to the sale of those issues. Referring to the above-quoted question and answer, Mr. Charles J. Grant was asked: "Is there anything you wish to state at this time in amplification to that answer?" to which he replied: "Yes. While I stated at that time that I wanted to deal in the issues of Clarence Hodson, I, at the same time, had in mind that I would eventually sell securities of other houses. I was at that time selling only the issues of Clarence Hodson, and as the question is asked in the application at another place, 'What have you sold in the last six months?' and I had only sold Clarence Hodson issues, I naturally stated I wanted to start business in Pennsylvania selling the same securities I was selling in New York."

In answer to the further question, "Is it your intention to confine yourself solely in the distribution and sale of the issues of Clarence Hodson?" Mr. Grant replied: "It is not. I intend to eventually branch out and sell various issues, the same as all securities dealers are doing. I think it is poor business to confine yourself entirely to one house because you never know first of all how long you are going to be able to sell that one issue and you may not be satisfied with it or they may not be satisfied with you, and, second, today, with diversification as the principal trend of the security buying, you should be in a position to serve your clients with almost everything they want."

The witness Grant testified: "I have been negotiating with the Bancamerica-Blair Corporation and the National American Company for real estate mortgage bonds and several other houses of various issues. Q. In other words, it is your aim to engage in the distribution of securities of various classes and of various houses? A. Correct. . . . A. In these issues of Clarence Hodson they are sold under a participating arrangement, certain dealers do not get the same spread as other dealers, which is a common practice with all houses of original issue, I understand. In our case we are considered dealers that are in a financial position to purchase our securities and pay for them and therefore get the best spread that is offered by the house of Hodson on account of being that type of dealer. We *buy our securities, pay for them,* get delivery of them, then resell them and deliver them to our clients."

The witness Grant was further asked:

"Q. Now, what is, in the investment world, if I may so speak, the various types of participation in these underwriting syndicates? A. Well, to describe it as a dealer, there are two types. There are the participating distributors and the firm distributors. In other words, the firm distributor is a man that goes into a syndicate and agrees to take a certain amount of securities at a certain price. He buys those securities and pays for them a certain price and then sells them at another price. Then the participating distributor enters into an agreement or contract with the house of issue to sell the securities they are issuing. . . . Q. Does the latter type of dealer make any firm commitment? A. No firm commitment in the latter type. Because he doesn't make a firm commitment he doesn't get as liberal a discount, or spread as we term it, on his purchase. He sells his securities and buys them from the house of issue at a greater price because he is not fortunate enough to have sufficient capital to buy these securities and put them on the shelf and is not able to make as much money on the resale."

In answer to the question, "Are all of those dealers who enter into such participation without firm commitments agents or salesmen of the house of issue or the manager of the syndicate?" the witness replied: "A. No, I don't see that there is any connection with the house of issue. They are distributors themselves doing a business and purchasing their securities from houses of issue. The house of issue has nothing to do with the method of doing business or who they employ or where they sell as they would have in the case of an agent or salesmen. . . . Q. Then, as I understand it, generally speaking, Mr. Grant, your firm actually purchases these securities with your own money from the various houses of issue and then go out and resell those securities which you own? A. In all cases. Q. Is there anything else that occurs to you, Mr. Grant, you would like to state on the record? A. It occurs to me that perhaps the commission did not understand exactly what I wanted to do in the way of becoming a dealer and operating under the Securities Act in the State of Pennsylvania. At least that is my understanding from the answer they have given me. I am a resident of the State of Pennsylvania and I want to operate in the State of Pennsylvania in accordance with the correct practices of the Securities Act. The fact that I stated I wanted to sell Hodson issues was due to the fact that is what I was selling, but it has been my plan to develop. I started in New York and started selling Hodson issues because I was able to get a contract with them that I felt was a good contract and a good one to start operating. Then as my business developed and it became settled, I wanted to branch out and naturally looked to Pennsylvania as a resident of Pennsylvania. I wanted to open up a branch office here and in the usual way develop a business and start operating. . . . By having offices in New York, Pennsylvania and Ohio I will be in a position to better participate in these syndicate offerings of the leading houses of issue. I never had any intention of confining myself to one type of security. A clientele can't be developed by having only one thing to offer them, particularly today with diversification being preached and practiced extensively."

We find nothing in the cross-examination by which the witness in any way departed from the statements which we have just quoted. In answer to a question by Chairman Leitch:

"Q. Why haven't you sold any other securities?" the witness explains: "A. Because I call it a good business practice to creep before you walk. I was acquainted with the Hodson issues, I had sold the Hodson issues before and wanted to get my business established and started and then *branch out afterwards*."

Is the petitioner, therefore, a dealer or merely a salesman under the Securities Act? Section two, paragraph (c) of the Securities Act of April 13, 1927, P. L. 273, defines "dealer" as follows:

"The term 'dealer' shall include every person or entity, other than a salesman who engages in this State, either for all or part of his or its time, directly or through an agent, in selling, offering for sale or delivery, or soliciting subscriptions to, or orders for, or undertaking to dispose of, or to invite offers for, or inquiries about, or dealing in, any manner in any security or securities within this State, including securities issued by such entity."

Section two, paragraph (d) of said act, P. L. 275, defines the term "salesman" as follows:

"The term 'salesman' shall, except as provided in section four, include every person or company employed or appointed or authorized by a dealer to sell, offer for sale or delivery, or solicit subscriptions to or orders for, or dispose of

inquiries about, or deal in any manner in, securities within this State, whether by direct act or through subagents."

It does not appear in the act that a dealer is required to buy and sell all types of securities. If one, otherwise a dealer, confines himself to the purchase and resale of the bonds, car trust certificates and stock of only The Pennsylvania Railroad Company, he is nevertheless a dealer.

The commission holds that if one restricts himself to the purchase and resale of securities sponsored by only one investment house, he must, therefore, be a salesman. The act does not so provide, and such an intent cannot be gathered from its plain language. If a reputable man applied to the commission for registration as a dealer and stated he intended to restrict his efforts to the sale of only those issues sponsored by the house of J. P. Morgan & Co., under this ruling he would not be allowed to do business; he could be registered only as a salesman of said company. It appears, however, that this company does not have security salesmen; therefore, he would be barred from going into a securities business in this state. We think there is nothing in the Securities Act to justify any such result. A merchant is no less a dealer because he purchases all the commodities which he sells from one particular wholesaler.

The evidence clearly shows that the petitioner purchases outright the securities it resells to its customers. The commission believes that the use of the language "commission basis" supports the contention of the defendant that the petitioner is salesman and agent. We think in the securities business the terms "commission" and "profits" are substantially synonymous. When a broker buys or sells stocks for a customer, his commissions are profits and his profits are commissions: Van Tine v. Hilands, 131 Fed. 124. In said case the plaintiff and the defendant entered into a partnership to share the profits and losses in the purchase and sale of certain stock; it was no defense to defendant's liability to account for all of the profits received that certain of them had been illegally received by accepting commissions from both the purchaser and the seller of the stock, in which improper conduct plaintiff did not participate. Held, by Coxe, Circuit Judge (page 127):

"It is urged that this is not the contract sworn to by Moreland, for the reason that it uses the word 'commissions' and not 'profits.' The point is not persuasive. In the business in which they were engaged the two words are substantially synonymous. When a broker buys or sells stock for a customer his commissions are profits and his profits are commissions."

Com. v. Vetterlein, 214 Pa. 21, throws some light upon the construction placed upon the word "dealer." In this case the court was construing the phrase "retail vendor of or dealer in goods, wares and merchandise," as found in the Mercantile License Tax Act of May 2, 1899, P. L. 184. This was an appeal from the judgment of the Superior Court, affirmed by the Supreme Court by a short per curiam. Writing the opinion of the Supreme Court, it was said by Mr. Justice Rice:

"'A dealer,' says Mr. Justice Black, 'in the popular and therefore in the statutory sense of the word, is not one who buys to keep, or makes to sell, but one who buys to sell again. He stands intermediately between the producer and the customer, and depends for his profit, not upon the labor he bestows upon his commodities, but upon the skill and foresight with which he watches the markets.'"

Slightly paraphrasing this opinion and applying it to the present case, we hold that a dealer in a statutory sense of the word is not one who buys to keep or makes to sell, but one who buys to sell again; he stands intermediately

between the broker having stock for sale and the purchaser, and depends for his profits upon the skill and foresight with which he watches the markets. We think this language appropriately describes the activities of the petitioners in the instant case.

In Com. *v.* Thorne, Neale & Co., 264 Pa. 408, which was also a mercantile license tax case, the taxpayer had contracts with four coal operators to sell their coal. The taxpayer made its own contracts with its customers and collected its own bills. It was directly liable to the operators from whom it purchased the coal. The taxpayer was limited to a profit of ten cents to fifteen cents a ton according to size, and argued that it was not a "wholesale dealer," but only an agent, and relied upon this fixed profit which it styled a "commission." In disposing of this contention, Mr. Justice Kephart (then on the Superior Court, whose opinion was quoted and affirmed *per curiam)* said (page 412):

"The fixed commission or profits of ten or fifteen cents per ton is entirely consistent with a contract of sale wherein profits are limited."

It is a well-established practice among certain manufacturers to sell their manufactured product to dealers, requiring the dealers to sell said manufactured product at a fixed price; and this practice has passed in review and has been confirmed by the courts of last resort. It has never been held that the dealer, who is thus restricted in the price at which he is to sell said commodities, is the agent of the manufacturer. He still continues to be a dealer.

It appears from the testimony that syndicate members who have the capital and facilities to make firm commitments obtain their share of the total issue at a lesser price than the member whose contracts are on a noncommitment basis. But in both cases each syndicate member's profit on the resale is fixed and determined in advance. If the fixed profit of the noncommitment member *ipso facto* makes him a salesman of the house sponsoring the issue, then it would seem to follow that the firm commitment member would also be a salesman. Such a construction of the act cannot be supported. Nor would it make any difference, for the purpose of administering the Securities Act, if a dealer at times first sold the security to the customer and then bought it from the house of issue. We think he would still be a dealer.

Our attention is directed to paragraph three of one of the options granted the applicants by Clarence Hodson & Co., which reads as follows:

"Nothing herein contained shall constitute you our agent or the agent of issuing corporation, and you shall not in any event represent yourself to be such agent, but shall deal on your own account as principal."

This paragraph clearly states the relationship between the petitioner in this case and Clarence Hodson & Co. This same paragraph is contained in all of the agreements between the petitioner and Hodson to which our attention has been directed. If, therefore, it appears in the contracts between the petitioner and Clarence Hodson & Co. that the petitioner was in no wise to be considered the agent of Hodson & Co., we think neither the Pennsylvania Securities Commission nor this court can now hold that, notwithstanding the agreement between the parties, the petitioner is still to be construed to be the agent of said Hodson & Co.

Again, referring to Exhibit IX of the record, we find the following language in the first paragraph of each of the contracts in said exhibit: *"We agree to sell you on your order . . . ,"* then follows the particular security which Hodson agrees the petitioner may purchase, and also states the purchase price which the petitioner is to pay. There is nothing in this or in paragraph three of these several contracts which would lead us to conclude, or

from which we can gather the intent, that the petitioner is the salesman or agent of Hodson & Co. Even adopting the familiar rule of looking through the form of these contracts to the substance, we find nothing that justifies that conclusion.

The question of good repute does not appear to be involved, nor is the selling plan to be adopted by the petitioner at issue.

We cannot, therefore, concur with the conclusion reached by the Pennsylvania Securities Commission that the petitioner is not a dealer in securities, but a salesman. As the final order of the commission is based and predicated upon its conclusion that the petitioner is not a dealer, we think said order must be reversed. We direct the Pennsylvania Securities Commission, defendant, to register the petitioner as a dealer upon its compliance with the Securities Act relating to the payment of the proper and legal fees. The costs of these proceedings are to be paid by the defendant.

From Homer L. Kreider, Harrisburg, Pa.